192 F.Supp.2d 467 (2002)
INTERNATIONAL BANCORP, L.L.C., et al., Plaintiffs,
v.
SOCIETE DES BAINS DE MER ET DU CERCLE DES ETRANGERS A MONACO, Defendant.
No. CIV.A.01-115-A.
United States District Court, E.D. Virginia, Alexandria Division.
March 25, 2002.
*468 *469 *470 James William Pravel, Pravel Intellectual Property law, P.C., Alexandria, VA, Kathleen Joanna Lynch Holmes, Richards, McGettigan, Reilly & West, P.C., Alexandria, VA, for plaintiffs.
George Reynolds Hedges, Gregory Paul Barbee, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, CA, Carl John Nichols, Boies Schiller & Flexner LLP, Washington, DC, for defendant.

REVISED MEMORANDUM OPINION[1]
ELLIS, District Judge.
This declaratory judgment trademark infringement action pits the owner of Monaco's famed gambling establishment, Casino de Monte Carlo, against an individual and five companies who have registered fifty-three ".com" and ".net" domain names that incorporate, in various ways, the name "Casino de Monte Carlo." The disposition of the parties' cross-motions for summary judgment presents substantive and jurisdictional issues.

I.

A. SBM
Defendant and counterclaim plaintiff Societe des Bains de Mer et du Cercle des Etrangers a Monaco (SBM) is a company established in the Principality of Monaco *471 in 1863 by charter from Prince Charles III of Monaco. SBM's majority shareholder is the government of Monaco. Its business is the management of a variety of resort hotels and gambling facilities in Monaco, including four gambling casinos, one of which is the Casino de Monte Carlo.[2] The record reflects that while SBM registered the "Casino de Monte Carlo" mark under the laws of Monaco in 1996, its application for the same trademark in this country, filed with the U.S. Patent and Trademark Office on November 7, 2001, is currently pending.[3] The record also reflects that SBM has registered and uses various domain names,[4] and while SBM currently provides no online gambling or gaming services, it is undisputed that SBM has such services under development.
In advertising its resort and gambling facilities, the record reflects that SBM has used the mark "Casino de Monte Carlo" in this country and throughout the world. Specifically, SBM has promoted its Casino de Monte Carlo through print media, films, and the Internet. Its magazine Societe, which is distributed in this country and elsewhere, describes and contains photographs of the Casino de Monte Carlo and uses the mark "Casino de Monte Carlo." SBM has also received substantial media coverage in this country regarding its resorts and casinos, especially the Casino de Monte Carlo.[5]
For the past eighteen years, SBM has operated a New York office to promote North American tourism in Monaco. These New York-based promotional efforts, which include advertising SBM's Casino de Monte Carlo by using the mark "Casino de Monte Carlo," occur throughout the United States by means of trade show participation, media advertising, charity partnerships, direct mail, and telephone marketing. In each of the past ten years, SBM has spent approximately four-million dollars annually on worldwide marketing efforts, with approximately twenty-five percent of this amount devoted to marketing efforts in the United States. As part of this marketing and promotional effort, SBM has annually mailed approximately *472 10,000 brochures that, inter alia, use the mark "Casino de Monte Carlo" to advertise this gambling facility to North American clients in the United States and Canada. A reflection of the impact of these promotional efforts is that as recently as the year 2000, approximately twenty-two percent of SBM's customers in Monaco were from North America. Undisputed evidence further reveals that the New York office was one of SBM's international sales offices from which American customers were able to book reservations.[6]
The record reflects that SBM is aware that the geographic term "Monte Carlo" is used by other entities in connection with Internet gambling.[7] And, while it is also true that SBM has not attempted to dispute every instance of such use, this case involves more than the use of the geographic term; rather, in this case, SBM challenges the registration and use of fifty-three domain names that allegedly incorporate in some fashion the entire mark "Casino de Monte Carlo." This use of the mark, according to SBM, creates the false impression that plaintiffs' websites are affiliated with SBM. Despite this allegedly infringing use of SBM's mark, there is no evidence of resulting financial loss to SBM.

B. The Plaintiff Companies and Levy
The declarative judgment plaintiffs are five companies: International Bancorp, L.L.C. (d/b/a I. Bancorp Europe), International Services, Inc., International Lotteries, L.L.C., Britannia Finance Corporation, and Las Vegas Sportsbook, Inc. (collectively referred to as the "plaintiff companies"). These entities are also named as counterclaim defendants in SBM's counterclaim. Also named as a counterclaim defendant is Claude Levy, a French national who resides in Belgium. Levy is the owner and operator of the five plaintiff companies, which the record reflects are all undercapitalized and have failed to observe many traditional American corporate formalities. It also appears that the plaintiff companies have (i) no officers, directors, or members other than Levy and his wife, Arja Levy, (ii) no employees, and (iii) essentially no corporate records. The record also reflects that Levy and his wife registered the disputed domain names on behalf of the five plaintiff companies, occasionally using aliases in doing so. The undisputed record also reflects that while the five plaintiff companies purport to be distinct entities, they have common leadership, common goals, and work together with a common purpose. A brief description of each of the five plaintiff companies follows.
International Bancorp, L.L.C., a Delaware limited liability company, registered six of the disputed domain names with Verisign, located in Herndon, Virginia.[8] Levy and his wife are the only members of International Bancorp. The company currently has no employees, no office, and no bank account. It has no principal place of business in the United States and its members *473 have never filed a tax return relating to the business.
International Services, Inc., is incorporated in St. Kitts, West Indies. It registered with Verisign thirty-one domain names challenged by SBM.[9] The corporation now manages and registers domain names for the other plaintiff companies. It has three shareholders, including Levy. International Services has no employees, no offices, and no bank accounts.
International Lotteries, L.L.C., is a Delaware limited liability company that registers domain names and develops websites. It has no employees, no offices, and no bank account. The company registered with Verisign twelve of the domain names that are now in dispute.[10] Levy and his wife are the sole members of the company.
Britannia Finance Corporation is a Delaware corporation that provides accounting and financial services for the other plaintiff companies. Britannia's sole directors are Levy and his wife. It has no employees and no offices, but does maintain bank accounts in European banks. The record reflects that Britannia maintained no corporate minutes and has never filed a tax return in any jurisdiction. Britannia registered with Verisign four of the domain names that are now in dispute.[11]
Las Vegas Sportsbook, Inc. is incorporated under the laws of the Republic of Panama and has registered domain names on behalf of the other plaintiff companies. Las Vegas Sportsbook has two corporate shareholders, both of which are owned by Levy, who acts himself as an agent on behalf of Las Vegas Sportsbook. Like the other plaintiff companies, Las Vegas Sportsbook has no employees, no offices, and appears to lack any source of revenue.
Levy, the five plaintiff companies, and their affiliates are in the business of developing and operating websites relating to the online gaming industry. Domain names are, of course, central to this effort. The first of the domain names at issue registered by one of the plaintiff companies was casinomontecarlo.com, which was registered by International Lotteries in 1997. Since then Levy and the five plaintiff companies have registered with Verisign the additional 52 disputed domain names.
According to the record, Levy, the five plaintiff companies and their affiliates have developed more than 150 websites devoted to online gambling.[12] Among *474 these websites are "Casino Monte Carlo," located at casinomontecarlo.com and "Monte Carlo Casinos," located at montecarlocasinos.com. These two sites are central to the plaintiff companies' online gambling activities. Located at these sites are the plaintiff companies' pages describing their online gambling services and containing pictures and graphics of the interior of a casino that appears to be copied from SBM's Casino de Monte Carlo.[13] Both sites invite visitors to download the plaintiff companies' software program entitled "Casino Monte Carlo." This program uses a greeting that reads "Welcome to Casino Monte Carlo" and contains a picture of the exterior of SBM's Casino de Monte Carlo.[14] Levy, the record reflects, authorized the use of these pictures of graphics.
Also located at these sites are the following statements which appear in part to refer or allude to SBM:
 "This casino is owned and managed by a group of U.S. corporations, including a U.S. finance company, and an international group of companies who have been in business for more than 140 years."
 "We are the only Internet gaming company to have the double gambling license from Casino Monte Carlo and from Las Vegas Casino."
 "For your protection, your funds are held in a top European bank, established over 100 years ago, which also provides the strictest banking secrecy in the world, something that is not available in the US."
 "The best Internet gambling magazine has named Monte Carlo Casino the Best Internet Casino for 1999."
Nor are these the only allusions to SBM to be found on the plaintiff companies' websites. At gamblingmagazine.com, a site registered to Britannia and controlled by Levy, the following statements were made:
 "Monte Carlo: a town and resort forming part of the principality of Monaco, on the Riviera, with a famous casino and the destination of an annual car rally...."
 "[H]ave you seen the stunning graphics of this soon-to-be famous casino? www.CasinoMonteCarlo.com."
 "[o]r would you prefer something more sublime? A location between mountain and sea, gardens, cultural events, only 29,000 residents, ideal for a romantic vacation, an independent state in the heart of Europe-the Principality of Monaco, and naturally, Monte Carlo, home of legendary casinos famous the world over. Instead of travelling [sic] there, try www.montecarlocasino.net."
Neither Levy nor any of the plaintiff companies hold any registered trademarks using the terms "Casino," "Monaco," or "Monte Carlo" (with or without a dash, joined or separated). And, as the record also makes clear, none of the plaintiff companies' websites using the disputed domain names contain any material that criticizes or parodies SBM or any of its facilities. Nor do any of theses sites specifically disclaim a commercial affiliation with SBM.
The record reflects that the plaintiff companies have on some occasions offered several of the disputed domain names for sale to the public at large by listing them *475 for sale with online domain name brokers affiliated with the plaintiff companies. Apart from these general offers of sale, there is no record evidence that the plaintiff companies offered to sell any of the disputed domain names to SBM.

C. Procedural History
When the plaintiff companies registered each of the fifty-three disputed domain names, they were required as a condition of registration to agree to arbitrate any dispute regarding ownership of the domain names in accordance with the Uniform Policy for Domain Name Dispute Resolution ("UDRP"), adopted by the Internet Corporation for Assigned Names and Numbers ("ICANN"). Pursuant to the UDRP, SBM filed complaints against four of the plaintiff companies: (1) International Bancorp, challenging the use of six domain names, (2) International Services, challenging the use of thirty-one domain names, (3) International Lotteries, challenging the use of twelve domain names, and (4) Britannia, challenging the use of four domain names, with the World Intellectual Property Organization ("WIPO") Arbitration and Mediation Center. See WIPO Case Nos. D2000-1323; D2000-1328; D2000-1327; D2000-1315. On January 8, 2001, WIPO issued non-binding decisions in these cases in favor of SBM, finding (i) that SBM had rights in the mark "Casino de Monte Carlo;" (ii) that the plaintiff companies' use of the term "Casino de Monte Carlo" as domain names and on web pages was identical and hence confusingly similar to SBM's mark; (iii) that the disputed domain names were registered and used in bad faith. See id. Accordingly, the panel ordered the plaintiff companies to transfer to SBM all domain names related to "Casino de Monte Carlo," including the fifty-three domain names here at issue. See id. To avoid having to do so,[15] the plaintiff companies then brought this complaint, seeking a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that the companies are entitled to retain ownership of the domain names in dispute.[16] Thereafter, Verisign, having received notice of this action, deposited the certificates for the fifty-three domain names with the Clerk of this Court. SBM's response to the complaint included a counterclaim, naming as defendants the plaintiff companies and Levy. Specifically, SBM's amended counterclaim asserts the following theories of recovery against Levy and the plaintiff companies:
(1) unfair competition and trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1125(a);
(2) trademark dilution in violation of the Federal Trademark Dilution Act ("FTDA"), 15 U.S.C. § 1125(c);
(3) cybersquatting in violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1);
(4) unfair competition in violation of 15 U.S.C. § 1126(h); and
(5) trademark infringement under the common law of Virginia.
The relief sought by SBM in its amended counterclaim includes (i) statutory damages in the amount of $100,000 per each of *476 the fifty-three allegedly offending domain names, pursuant to 15 U.S.C. § 1117(d); (ii) transfer of each of the fifty-three domain names, pursuant to 15 U.S.C. § 1125(d)(1)(C); and (iii) an injunction forbidding the plaintiff companies and Levy from registering domain names that contain the mark "Casino de Monte Carlo" or similar terms and from using the mark on the Internet.
Levy, for his part, promptly filed a timely motion to dismiss the counterclaim against him, citing the absence of personal jurisdiction.
The plaintiff companies and SBM filed cross-motions for summary judgment and oral argument was heard on December 7, 2001. In lieu of a bench trial, the parties agreed that the matter should be submitted on the existing voluminous summary judgment record, which contains numerous exhibits and affidavits. Accordingly, this matter is now ripe for adjudication.

II.
Summary judgment is appropriate when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A "mere scintilla" of evidence, however, is not enough, for it is well-established that for the nonmoving party to avoid summary judgment, the evidence must be sufficient for a reasonable jury to find in its favor when viewed in the light most favorable to that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

III.
Levy's challenge to personal jurisdiction is the threshold question presented. In essence, Levy claims he is not subject to this Court's jurisdiction because his only contacts with Virginia are those incidental to the registration of the disputed domain names with Verisign in Herndon, Virginia. This argument is well-taken, as the record confirms that Levy has indeed not had contacts with Virginia other than those incident to domain name registration and it is well-established that personal jurisdiction cannot be based solely on the registration of a domain name with Verisign.[17] Yet, this does not end the analysis of the personal jurisdiction issue, as SBM argues that personal jurisdiction over Levy in Virginia exists because Levy is the alter ego of the plaintiff companies, and because they have come voluntarily to Virginia to invoke the Court's jurisdiction, Levy, too, is subject to jurisdiction here.
This argument presents two issues: (i) whether the proper law to apply for piercing the corporate veil for jurisdictional purposes is the law of each of the plaintiff companies' domiciliary states or countries, or the law of Virginia, the forum state; and (ii) whether under the proper governing law, the record in this case supports *477 piercing the veil and finding personal jurisdiction over Levy.
Analysis of the first issue appropriately begins with Rule 4(k)(1), Fed.R.Civ. P., which provides that the jurisdiction of federal courts is determined by the jurisdictional laws of the forum state, such as the forum state's long-arm statute. It follows, then, that the proper governing law for the question of personal jurisdiction is Virginia law. So, Virginia law governs the question whether personal jurisdiction over a person who controls a company can be obtained by piercing the company's veil and the question whether in this case the various veils should be pierced to reach Levy. This follows not just from Rule 4(k)(1), Fed.R.Civ.P., but also from the sensible proposition that it is the forum state, not the domiciliary state of a company, that has a valid interest in the jurisdictional reach of the forum state's courts (and, derivatively through Rule 4, Fed. R.Civ.P., the federal courts in that state).[18]
It is similarly sensible that piercing the corporate veil should be a permissible means of conferring jurisdiction in a forum over the alter ego of a company that is subject to jurisdiction in the forum, especially where, as here, the record reflects that Levy, the alleged alter ego, directed the acts of the plaintiff companies that are in issue, namely registering domain names, creating websites, and filing this action. Although no reported Virginia case squarely considers this issue, decisions from other jurisdictions uniformly reach this sensible result.[19] Nor is there any reason to believe that the Supreme Court of Virginia would conclude otherwise. Indeed, a contrary result might well allow a company's alter ego to abuse the corporate form and then escape process and liability in Virginia for acts of the company that occur in Virginia and are directed by the alter ego.
The final question to be resolved is whether under Virginia law the veil of any plaintiff company should be pierced to allow SBM to assert jurisdiction over Levy in Virginia. This question must be answered in the negative. Although the laws of other states might support piercing the plaintiff companies' veils on this record,[20] Virginia law imposes a more stringent standard for piercing the corporate veil, a standard not met here. Virginia's more rigorous standard requires "proof that the alleged alter ego used the corporation to disguise some legal wrong." See Perpetual Real Estate Services, Inc. v. Michaelson *478 Properties, Inc., 974 F.2d 545, 548 (4th Cir.1992). In Virginia, the proponent of piercing must establish that "the corporation was a device or sham used to disguise wrongs, obscure fraud, or conceal crime." Cheatle v. Rudd's Swimming Pool Supply Co., Inc., 234 Va. 207, 360 S.E.2d 828, 831 (1987). It is clear from this record that SBM has not established that the plaintiff companies were created or used merely to disguise a wrong, obscure fraud, or conceal crime. Thus, the corporate veils of the plaintiff companies cannot be pierced under Virginia law, and it follows that personal jurisdiction over Levy does not exist and the counterclaims against him must be dismissed.

IV.
SBM asserts that the plaintiff companies' use in American commerce of the term "Casino de Monte Carlo" in the disputed domain names and on various websites constitutes trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1125(a).[21] To prevail on its trademark infringement cause of action, SBM must prove the following elements:
(1) that SBM possesses a protectable mark;
(2) that plaintiff companies used the mark;
(3) that plaintiff companies' use of the mark occurred "in commerce;"
(4) that plaintiff companies used the mark "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and
(5) that plaintiff companies used the mark in a manner likely to confuse consumers.
People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 364 (4th Cir.2001); see also Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc., 130 F.3d 88, 91 (4th Cir.1997); 4 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 25:76 (4th ed. 2001) ("McCarthy").
Elements two, three, and four are plainly met. There is no dispute that the plaintiff companies use the "Casino de Monte Carlo" mark in whole or in part in forty-three of the fifty-three domain names at issue.[22] It is also undisputed that the mark "Casino de Monte Carlo" is used in various ways as material posted on the websites corresponding to the plaintiff companies' domain names. Nor is there any doubt that these uses occurred in United States commerce, as the plaintiff companies' websites offered online gambling to Internet users in this country. And, the record reflects that the plaintiff companies used some form of the "Casino de Monte Carlo" mark as domain names and as material on websites in connection with the sale, offers of sale, and advertising of the Internet gambling services they provide.
*479 While elements two, three, and four require little discussion, the remaining two elements require more extended analysis. The first of these elements is whether SBM's "Casino de Monte Carlo" mark is a trademark protectable in this country. As noted, SBM has registered the mark "Casino de Monte Carlo" in Monaco, but has yet to complete the federal registration process in this country. Yet, this is not fatal to SBM's claim, as it is well-established that Section 1125(a) "generally has been construed to protect against trademark, service mark, and trade name infringement even though the mark or name has not been federally registered." Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir.1990). But where, as here, the mark in issue is not federally registered, a mark holder seeking Section 1125(a) relief must establish that the mark has been used in American commerce and that the mark is distinctive. See Washington Speakers Bureau, Inc. v. Leading Authorities, Inc., 33 F.Supp.2d 488, 494 (E.D.Va.1999), aff'd, 217 F.3d 843, 2000 WL 825881 (4th Cir.2000).
As an initial matter, it is clear that SBM's "Casino de Monte Carlo" mark is used in United States commerce. A mark is used in commerce "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services." 15 U.S.C. § 1127. While no authority in this circuit directly addresses the scope of the phrase "use in commerce" in this context, other circuits have reached the sensible conclusion that the term "use in commerce" under the Lanham Act "denotes Congress's authority under the Commerce Clause rather than an intent to limit the [Lanham] Act's application to profit making activity."[23] It follows, then, that the Lanham Act's "use in commerce" requirement does not require more than the customary jurisdictional effect on interstate commerce.[24]
In this respect, however, it is noteworthy that one court of appeals has determined that the mere advertising of a mark in the Untied States does not establish use in American commerce. See Buti v. Impressa Perosa, S.R.L., 139 F.3d 98, 106 (2d Cir.1998).[25] Yet, this is not a mere advertising case; to the contrary, it is clear from the undisputed record that SBM's New York office was one of SBM's many international sales offices from which customers could book reservations. Thus, the record shows that in this respect, *480 SBM "services are rendered" in the United States. 15 U.S.C. § 1127.
Use of the mark in this country, by itself, does not establish that the mark deserves Section 1125(a) protection; distinctiveness must also be established. See Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 464 (4th Cir.1996). In this respect, it is settled that generic terms are not entitled to trademark protection, while descriptive, suggestive, and arbitrary marks are. See Washington Speakers, 33 F.Supp.2d at 494. It is clear, and SBM concedes, that the term "Casino de Monte Carlo" is a descriptive mark. Geographic terms, such as "Monte Carlo," "are generally understood to constitute descriptive marks when they indicate the geographic source of the service or product." Id. at 495. In this case, the term "Monte Carlo" identifies the geographic source of the casino that SBM provides. Thus, just as the term "Washington" in "Washington Speakers Bureau" makes that mark descriptive, so too does the term "Monte Carlo" in "Casino de Monte Carlo." See id. at 495.[26]
Descriptive marks are deemed distinctive, thus meriting protection, only if the party claiming protection can demonstrate that the mark has acquired a secondary meaning among the relevant consuming public. See Larsen v. Terk Technologies, 151 F.3d 140, 148 (4th Cir. 1998); Washington Speakers, 33 F.Supp.2d at 495. For geographically descriptive marks, this occurs when "the mark no longer causes the public to associate the goods with a particular place, but to associate the good [or service] with a particular source." Resorts of Pinehurst, Inc. v. Pinehurst Nat. Corp., 148 F.3d 417, 421 (4th Cir.1998). Thus, a mark will merit protection only "when its primary significance to the consuming public is not the descriptive information it imparts, but [rather is] the mark's association with a particular business...." Washington Speakers, 33 F.Supp.2d at 496.
Courts examine the following factors to determine whether secondary meaning exists:[27]
(1) advertising expenditures;
(2) consumer studies linking the mark to a source;
(3) sales successes;
(4) unsolicited media coverage of the product;
(5) attempts to plagiarize the mark; and
(6) the length and exclusivity of the mark's use.
See Perini, 915 F.2d at 125; see also Washington Speakers, 33 F.Supp.2d at 496.
While mark holders normally bear the burden of proving secondary meaning,[28] in this circuit, "evidence of intentional, direct copying [of a trademark or trade dress] establishes a prima facie case of secondary meaning sufficient to shift the burden of persuasion to the [alleged infringer] on *481 that issue."[29] In this circuit, therefore, direct copying gives rise to a presumption upon which judgment must issue in the absence of rebutting proof.
This principle applies here. The record leaves no doubt that the plaintiff companies intentionally and directly copied SBM's mark. While there is no direct evidence of intentional copying, inferring the intent of the plaintiff companies is proper, given that the putatively infringing term is identical to SBM's mark and the infringing use is in the same relevant market; gambling services. Thus, the presumption of a likelihood of confusion applies here. Of the fifty-three domain names at issue, forty-three contain the term "Casino de Monte Carlo" or its essential equivalent.[30] Moreover, the plaintiff companies' websites contain software ready for download that features pictures of the exterior of the actual Casino de Monte Carlo. The plaintiff companies' websites also contain pictures of an interior decor strikingly similar to that of the Casino de Monte Carlo. In these circumstances, the inference of intentional copying is too compelling to deny and the secondary meaning of the mark "Casino de Monte Carlo" is properly presumed.
Nor has this presumption been rebutted, as the record reflects that the plaintiff companies have failed to show that the Perini factors weigh against secondary meaning. Thus, the plaintiff companies have not rebutted SBM's showing that it has spent millions of dollars in this country over the last ten years using its mark to advertise and promote its Casino de Monte Carlo and its other resorts. The plaintiff companies' sole response to this is to assert that SBM's advertising and promotional expenditures related to SBM's resorts generally, rather than to the Casino de Monte Carlo, specifically. Although the record does not specify how much was spent solely on advertising and promoting the Casino de Monte Carlo, there is no doubt that a substantial portion was devoted to the Casino de Monte Carlo, SBM's premier gambling facility.
The second Perini factor is neutral, as neither party submitted any consumer studies showing a link or lack of a link between the mark "Casino de Monte Carlo" and SBM's Casino de Monte Carlo. Given that the burden on secondary meaning has shifted to the plaintiff companies, the absence of such a study counts against the plaintiff companies and in favor of the existence of secondary meaning.
As to the third Perini factor, the plaintiff companies have not rebutted SBM's record showing that the Casino de Monte Carlo has enjoyed great sales success. SBM presents undisputed evidence that twenty-two percent of its resort customers are from the United States and Canada. *482 While there is no evidence establishing precisely what proportion of these customers are American, there can be little doubt that SBM has a substantial number of American customers. And while it is true that the record does not show precisely how many of these sales related specifically to the Casino de Monte Carlo or to the power of the mark "Casino de Monte Carlo," there is a reasonable inference, unrebutted by the plaintiff companies, that a substantial degree of SBM's sales success is attributable to the distinctiveness of the Casino itself and hence of the "Casino de Monte Carlo" mark. The fourth Perini factor-unsolicited media coverage of the services available at SBM's Casino de Monte Carlo-is also unrebutted by the plaintiff companies and weighs convincingly in favor of the mark's distinctiveness. Fifth, the record reflects evidence of the use by others of SBM's "Casino de Monte Carlo" mark or derivations of it.[31] Accordingly, it is clear that the "Casino de Monte Carlo" mark is considered worth plagiarizing for its commercial value in calling to minds of consumers SBM's well-known gambling facility. Finally, on the sixth Perini factor, the uncontradicted record reflects that SBM's use of the mark is exceptionally long-standing, which suggests distinctiveness. To be sure, the record also reflects that SBM's long-standing use of the mark has not been exclusive.[32] While this might suggest a lack of distinctiveness in some contexts, it is here more suggestive of the power of the mark to attract plagiarists seeking to benefit from an implied association with SBM's casino. In sum, far from rebutting the presumption of distinctiveness that operates here, the Perini factors, when applied to the facts of this case, actually support that presumption.
The final element of a Section 1125(a) trademark infringement claim is whether the record shows that the plaintiff companies' unauthorized use of the term "Casino de Monte Carlo" creates a likelihood of confusion for an "`ordinary consumer' as to the source or sponsorship of the goods," in this case, online gambling services. Anheuser-Busch, Inc. v. L & L Wings, Inc., 962 F.2d 316, 318 (4th Cir. 1992).[33] And, "[t]o determine whether a likelihood of confusion exists, a court should not consider how closely a fragment of a given use duplicates the trademark, but must instead consider whether the use in its entirety creates a likelihood of confusion." Doughney, 263 F.3d at 366. When analyzing whether confusion is likely, courts consider the following factors:
(1) the strength of the mark;
(2) the similarity between the alleged infringer's domain name and/or use and the mark;
(3) the similarity between defendant's services and the service provided at the domain name;
(4) the similarity between the facilities defendant uses in its business and the facilities used in connection with the provision of services under the disputed domain names;

*483 (5) the similarity between defendant's advertising and advertising used to promote services offered by the plaintiff companies;
(6) the intent underlying use of the mark; and
(7) the existence of any actual confusion.
See Petro Stopping Ctrs., 130 F.3d at 91 (citing Pizzeria Uno, 747 F.2d at 1527). These factors are neither exhaustive nor exclusive. See Pizzeria Uno, 747 F.2d at 1527. It is well-established that although "the likelihood of confusion is a factual issue dependent on the circumstances of each case..., summary judgment is appropriate when the material, undisputed facts disclose a likelihood of confusion," a determination that courts make in light of the seven factors. Pinehurst, 148 F.3d at 422. Thus, although likelihood of confusion is a factual issue, weighing the seven factors that determine likelihood of confusion is a judicial function. See id. Furthermore, in determining whether a likelihood of confusion exists, courts should consider the specific facts and circumstances of each case. See Anheuser-Busch, 962 F.2d at 318.
As in distinctiveness, it is proper in this circuit to presume "a likelihood of confusion upon a showing that the defendant intentionally copied the plaintiff's trademark or trade dress." Larsen, 151 F.3d at 149 (citing Kramer Manufacturing, 783 F.2d at 448 n. 24).[34] Given the circumstances, it is appropriate to infer that the plaintiff companies' copying was intentional, as was done in the discussion of distinctiveness.[35] Forty-three of the plaintiff companies' domain names are copies of SBM's "Casino de Monte Carlo" mark, either verbatim or with insignificant variations. The plaintiff companies seek to bolster the association with the Casino de Monte Carlo in the minds of consumers by using pictures of SBM's Casino de Monte Carlo and "interior" graphics that are virtually identical to the Casino de Monte Carlo's decor. Thus, the plaintiff companies, who have the burden of proof, must show that there is no likelihood of confusion.
Although the plaintiff companies bear the burden on the issue of likelihood of confusion, a finding of likelihood of confusion would be proper regardless of which party bears the burden because four of the seven factors weigh heavily in SBM's favor. First, it has been established that SBM's "Casino de Monte Carlo" mark has secondary meaning and is, therefore, strong and distinctive. It is also clear that the plaintiff companies used the term "Casino de Monte Carlo," or a substantially similar term, in the registration and use of the forty-three domain names and on their various websites. Furthermore, both SBM and the plaintiff companies offer the same service-that is, gambling. Finally, it is evident the plaintiff companies' intended to enhance the marketability of their services by using the term "Casino de Monte Carlo" to invite consumers to believe that plaintiff companies are associated with SBM's casino. Thus, because the plaintiff companies' use of forty-three domain names creates a likelihood of confusion, they have failed to satisfy their burden under Larsen of showing the contrary. Therefore, the use of the forty-three domain names infringes SBM's "Casino de Monte Carlo" trademark.

V.
SBM's claim for trademark dilution under the Federal Trademark Dilution *484 Act, 15 U.S.C. § 1125(c), does not fare as well as its infringement claim. In this circuit, a threshold requirement for a dilution claim is a showing of actual economic harm to SBM's mark, rather than a mere threatened injury to the mark as some other circuits require. See Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Development, 170 F.3d 449, 453 (4th Cir.1999) (announcing and applying the Fourth Circuit standard); Cable News Network L.P., L.L.L.P. v. Cnnews.com, 177 F.Supp.2d 506, 521 (E.D.Va.2001) (discussing the circuit split on this issue). Under the Ringling Bros. standard, SBM may establish actual economic harm in three ways. See id. at 465. First, SBM may show proof of an actual loss in revenue attributable to the offending domain name. See id. It is undisputed that there is no evidence of financial loss to SBM as a result of the plaintiff companies' actions. Second, SBM may conduct a valid consumer survey designed to demonstrate that consumers or customers in a relevant market mentally associate the offending domain name with the famous mark and also to determine "further consumer impressions from which actual harm and cause might rationally be inferred." Id. Here, there is no evidence showing that "some quanta of the original mark's identifying ability or selling power has been diminished." See Ringling Bros., 170 F.3d at 465 (internal citations and quotation marks omitted). Third, to complement other proof, SBM may show contextual factors such as the extent of the junior mark's exposure, the similarity of the marks, and the firmness of the senior mark's hold. See id. While the record reflects such contextual factors, Ringling Bros. makes clear that these contextual factors, standing alone, do not provide dilution; they serve only to complement other, more probative factors. See id. In sum, because this record contains no evidence of actual economic harm attributable to the registration and use of the domain names at issue, SBM has failed to establish a basis for summary judgment on its dilution claims under Sections 1125(c), and, therefore, 1125(d).[36]

VI.
Next, SBM alleges that the plaintiff companies' use of the "Casino de Monte Carlo" mark violates the in personam provisions of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1). The ACPA imposes liability in a civil action on a person by the owner of a mark if, without regard to the goods or services of the parties, that person
(i) has a bad faith intent to profit from that mark and
(ii) registers, traffics in, or uses a domain name that-
(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; [or]
(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark....
15 U.S.C. § 1125(d)(1)(A). Thus, for SBM to succeed in this in personam ACPA claim, it must prove that the plaintiff companies' use of the disputed domain names constitutes either trademark infringement or trademark dilution and it must also demonstrate that the plaintiff companies *485 have or had a bad faith intent to profit from use of the "Casino de Monte Carlo" mark. See Doughney, 263 F.3d at 366-68. While SBM has failed to prove trademark dilution, it has established trademark infringement, pursuant to 15 U.S.C. § 1125(a). The next step, then, is to determine whether the plaintiff companies have acted with the requisite bad faith.
The ACPA lists nine nonexclusive factors for courts to consider in determining whether a domain name has been registered or used in bad faith.[37] Although courts are not obliged to consider every factor and may also consider factors not listed in Section 1125(d)(1)(B)(i), the statutory factors are typically what courts use to determine bad faith. See Cnnews.com, 177 F.Supp.2d at 522. Each factor addresses whether there is some legitimate reason for the registrant or user of a domain name to possess or make use of the disputed domain name. See id.
The first factor is whether the plaintiff companies have any legitimate rights in the "Casino de Monte Carlo" mark. See 15 U.S.C. § 1125(d)(1)(B)(i)(I). On this record, it is clear that none of the plaintiff companies own, or claim to own, any rights in any trademark or service mark that is identical or similar to the "Casino de Monte Carlo" mark. This factor, therefore, weighs in favor of a conclusion of bad faith.
The second factor is whether the term "Casino de Monte Carlo" constitutes a legal name or commonly-used name for any of the plaintiff companies.[38]See 15 U.S.C. § 1125(d)(1)(B)(i)(II). A putative cyberpirate can satisfy this factor only if its name or commonly-used nickname is the same as the domain name in dispute. It is clear that "Casino de Monte Carlo," or a similar term, is not the legal name or nickname of any of the plaintiff companies.[39]
*486 The third factor-whether the plaintiff companies engaged in prior, bona fide use of the "Casino de Monte Carlo" mark[40]- also supports a bad faith finding. As the record reflects, SBM has used the "Casino de Monte Carlo" mark for over one-hundred and forty years. And, given that the SBM mark has secondary meaning, no bona fide use by the plaintiff companies of "Casino de Monte Carlo" predates SBM's use of the mark.
The fourth factor is whether the plaintiff companies engaged in any bona fide non-commercial or "fair use" of the "Casino de Monte Carlo" mark. See 15 U.S.C. § 1125(d)(1)(B)(i)(IV). The purpose of this factor is to protect domain name registrants and users engaged in protected activities, such as political criticism or parody.[41] Here, the plaintiff companies' use of the domain names is purely commercial and involves none of these. Thus, this factor also supports a conclusion of bad faith.
The fifth factor is whether the plaintiff companies intended to divert consumers from SBM's online location to a site accessible under the disputed domain names that could harm the goodwill of SBM's mark, either for commercial gain or with the intent to tarnish or disparage the mark by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the website. See 15 U.S.C. § 1125(d)(1)(B)(i)(V). As intent is rarely discernible directly, it must typically be inferred from pertinent facts and circumstances. See Cnnews.com, 177 F.Supp.2d at 525. In this regard, the wholesale inclusion of the "Casino de Monte Carlo" mark in the disputed domain names evidences the plaintiff companies' intent to divert Internet users from SBM's services. Indeed, in at least one of plaintiff companies' websites, Internet users were invited to gamble online rather than travel to Monaco. Thus, the fifth factor weighs in favor of bad faith.
The sixth factor is whether the plaintiff companies offered to transfer or sell the domain names for financial gain without having an intent to use them in the bona fide offering of any goods or services. See 15 U.S.C. § 1125(d)(1)(B)(i)(VI). While most of the plaintiff companies' disputed domain names have been offered for sale, they have been offered to the general public and, in the meantime, the plaintiff companies have continued to offer gambling services on these sites. It is clear that, whatever the motives of the plaintiff companies, selling domain names to SBM is not their sole motivation for registering domain names. Thus, this factor is neutral on the issue of bad faith.
The seventh factor is whether the plaintiff companies provided material and misleading false contact information when applying for the registration of the domain name. See 15 U.S.C. § 1125(d)(1)(B)(i)(VII). It is undisputed *487 from the record that aliases were used when submitting contact information for many of the websites. While there is no evidence that these aliases were used with the intent to deceive or mislead, their use creates an atmosphere of deception. Thus, this factor marginally supports a finding of bad faith.
The eighth factor is whether the plaintiff companies registered or acquired multiple domain names that they knew were identical or confusingly similar to the distinctive marks of others. See 15 U.S.C. § 1125(d)(1)(B)(i)(VIII). This factor is designed to address the phenomenon of "warehousing," that is, the registration of many domain names consisting of various identical or similar combinations of the marks of others.[42] In this case, the plaintiff companies registered forty-three domain names that contain the term "Casino de Monte Carlo." This factor, then, does raise an inference of bad faith.
The ninth factor concerns the extent to which the mark incorporated in the registrant's domain name registration is or is not distinctive and famous. See 15 U.S.C. § 1125(d)(1)(B)(i)(IX). Given that the "Casino de Monte Carlo" mark is deemed distinctive, this factor supports a finding of bad faith.
In sum, eight of the nine statutory factors support SBM's claim that the forty-three domain names have been registered and used in bad faith. It is also apparent that the plaintiff companies fall outside the ACPA's "safe harbor," which provides that "[b]ad faith intent... shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii) (comporting with 15 U.S.C. § 1115(b)(4)). The Lanham Act provides that fair use constitutes:
the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party or their geographic origin....
15 U.S.C. § 1115(b)(4). It is clear that the plaintiff companies have not made "fair use" of SBM's "Casino de Monte Carlo" mark. Indeed, the term "Casino de Monte Carlo" is not the name of any of the plaintiff companies. And, it is clear that the plaintiff companies' services do not originate in Monte Carlo. Thus, as the plaintiff companies had no reasonable ground to think that they engaged in fair use, they may not invoke the ACPA's safe harbor provisions.

VII.
SBM also asserts a claim pursuant to 15 U.S.C. § 1126(h). This section provides protection against unfair competition and trademark infringement to the class of individuals identified in 15 U.S.C. § 1126(b), that is, any person whose country of origin is a party to a convention or treaty relating to trademark law or unfair competition to which the United States is also a party, or extends reciprocal rights to nationals of the United States by law, "to the extent necessary to give effect to any provision such as a convention, treaty, or reciprocal law." Thus, when read with Section 1126(b), Section 1126(h) "provide[s] *488 foreign nationals with rights under United States law which are coextensive with the substantive provisions of the treaty involved." Scotch Whisky Ass'n v. Majestic Distilling Co., Inc., 958 F.2d 594, 597 (4th Cir.1992). The only treaty cited by SBM, the Paris Convention for the Protection of Industrial Property, 24 U.S.T. 2140,[43] creates no substantive rights beyond those independently provided in the Lanham Act. See Scotch Whisky, 958 F.2d at 597.[44] Given this, there is no occasion here for the operation of Section 1126(h). Accordingly, SBM's Section 1126(h) claim fails.

VIII.
SBM also asserts a common law trademark infringement claim against the plaintiff companies, which, in the circumstances, is a claim governed by Virginia law.[45] It is well-established that with one exception,[46] "the requirements for success on the merits of [a Virginia trademark] claim are substantially similar to those for the federal Lanham Act claim." Rubbermaid Commercial Products, Inc. v. Contico Intern., Inc., 836 F.Supp. 1247, 1262 (W.D.Va.1993) (citing Rosso & Mastracco v. Giant Food Shopping Center, 200 Va. 159, 104 S.E.2d 776 (1958)). Because federal law adequately provides the relief SBM seeks, it is unnecessary to reach the more difficult issue on this record of infringement under Virginia law, which does not incorporate the burden-shifting analysis of the Larsen line of cases.

IX.
The plaintiff companies argue that SBM's claims are barred by the statute of limitations. As the Lanham Act provides no express statute of limitations for filing trademark infringement claims, it is proper to use the analogous state limitations period. See Reed v. United Transp. Union, 488 U.S. 319, 323-24, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989). Under Virginia law, the statute of limitations period for personal injuries is two years; the period for injuries to property is five years. See Va.Code § 8.01-243. Because trademark rights have the characteristics of property, and indeed are so treated by owners of these rights,[47] it would appear that infringement claims brought pursuant to the Lanham Act constitute injuries to property rather than personal injuries. Indeed, one court in this district has so held. See *489 Hoey v. Dexel Systems Corp., 716 F.Supp. 222, 224 (E.D.Va.1989). Yet, only two years after this decision, another court in this district concluded that false advertising under the Lanham Act was a personal injury. See Unlimited Screw Products, Inc. v. Malm, 781 F.Supp. 1121, 1126 (E.D.Va.1991). Clearly, these two rulings are not inconsistent because trademark infringement may be viewed as damaging property, whereas false advertising is more akin to personal injury. Yet, subsequent cases have ignored this apparent distinction and have simply cited Malm, without analysis, for the proposition that all Lanham Act claims, including trademark infringement, carry a two-year statute of limitations period. See CACI Int'l v. Pentagen Technologies Int'l, 1995 WL 679952, * 3 (4th Cir.1995) (unpublished); Teaching Co. Ltd. Partnership v. Unapix Entertainment, Inc., 87 F.Supp.2d 567, 585 (E.D.Va.2000). Neither of these decisions, however, is binding.[48]
Although the better view seems to be that trademark infringement is an injury to property, it is ultimately unnecessary to reach this issue because SBM's claims are not time-barred under the limitations period for either property or personal injury. The parties do not dispute that the matter is not time-barred if a five-year period is applicable. And, even if the statute of limitations period is only two years, SBM's claim of trademark infringement is timely. Although plaintiff companies argue that all claims regarding any domain name registered two years prior to the complaint are untimely, this argument is unpersuasive. It is well-settled in this circuit that even if some acts of trademark infringement fall outside the statute of limitations period, other infringing acts by that same party occurring within the limitations period are not time-barred. See Lyons Partnership, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 797 (4th Cir.2001). Thus, although some of the disputed domain names were registered more than two years prior to the filing of this complaint, the action regarding these names is nonetheless timely, given that the plaintiff companies' other infringing conduct-using domain names to infringe SBM's "Casino de Monte Carlo" mark, offering the disputed domain names for sale, and maintaining websites that contain material infringing the "Casino de Monte Carlo" mark-occurred within two years of the filing of the complaint. Thus, SBM's claim of trademark infringement are timely.[49] Furthermore, SBM's claims brought pursuant to the ACPA are clearly timely because the complaint was brought within two years of the enactment of the ACPA. Thus, even if SBM's claim of trademark infringement pursuant to Section 1125(a) of the Lanham Act were time-barred, the ACPA claim, which can provide all the relief SBM requests, is timely.[50]

*490 X.
SBM seeks statutory damages in the amount of $100,000 for each of the offending domain names, pursuant to 15 U.S.C. § 1117(d);[51] transfer of each of the fifty-three domain names, pursuant to 15 U.S.C. § 1125(d)(1)(C), and an injunction forbidding the plaintiff companies from registering domain names that contain the mark "Casino de Monte Carlo" and from using that mark on the Internet. As forty-three domain names infringe SBM's mark, the plaintiff companies must be ordered to transfer each of the forty-three infringing domain names to SBM. And, the plaintiff companies must be enjoined from registering domain names containing the mark "Casino de Monte Carlo" and from using that mark on the Internet.
SBM also should receive statutory damages with respect to the forty-three infringing domain names. Although a number of courts have confronted the statutory damages provision of Section 1117(d), none have articulated concrete factors for determining the amount to be awarded. A review of the cases reveals that courts reserve the high-end of the $1,000 to $100,000 range for the most egregious offenders.[52] Such cases are generally deemed "exceptional"[53] under Section 1117(a) and therefore also result in an award of attorneys' fees.[54] Where the infringer's conduct is less egregious, but still "exceptional," and therefore warranting attorneys' fees, courts award less in statutory *491 damages.[55] Finally, when an infringer's conduct is not deemed "exceptional," attorneys' fees are not awarded and lower statutory damages are the norm. See Mattel, Inc. v. Adventure Apparel, 2001 WL 1035140, *5 (S.D.N.Y.2001) (holding that when little actual harm falls upon plaintiff, damages of $1,000 per domain name are sufficient).[56]
In this case, while SBM has proven that the plaintiff companies acted with bad faith for purposes of ACPA liability, the plaintiff companies' conduct is neither malicious nor fraudulent, as required to obtain attorneys' fees. See Doughney, 263 F.3d at 370 (holding that a mere showing of bad faith for the purpose of establishing ACPA liability is not enough to mandate an award of attorneys' fees). Moreover, nothing in the record demonstrates a finding of actual economic harm.[57] Thus, it is appropriate to award SBM statutory damages in the amount of $5,000 for the domain names casinomontecarlo.com and montecarlocasino.net, the two websites that provided the "Casino Monte Carlo" software to web surfers to download, and $1,000 for the remaining forty-one infringing domain names, thus totaling, $51,000.00.[58]

XI.
For the reasons stated herein, SBM's counterclaim against Levy should be dismissed pursuant to Rule 12(b)(2), Fed. R.Civ.P. Furthermore, SBM's motion for summary judgment should be granted and plaintiffs' motion for summary judgment should be denied with respect to the following domain names:
 International Bancorp: montecarlocasino.net, montecarlocasino.org, montecarlocasino.com, monte-carlo-casino.com, casinosmontecarlo.com, and emontecarlocasino.com.
 International Services: casinodemontecarlo.net, casino-montecarlo.net, casinomonte-carlo.net, casinomontecarlo.org, casinosmontecarlo.net, casinosmontecarlo.org, casinomontecarloonline.com, ecasinomontecarlo.com, ecasinomontecarlo.net, emontecarlocasino .com, emontecarlocasino.net, e-casinomontecarlo.net, e-montecarlocasino.net, lemontecarlocasino.net, montecarlocasino.net, montecarlocasinoonline.com, montecarlocasinoonline.net, montecarloonlinecasino.com, montecarloonlinecasino.net, sexycasinomontecarlo.com, sexymontecarlocasino.com, sexymontecarlocasino.net, webcasinomontecarlo.com.
 International Lotteries: casinomontecarlo.com, montecarlocasinos.com, lecasinodemontecarlo.com, casinodemontecarlo.com, lemontecarlocasino.com, *492 lecasinomontecarlo.com, casinomonte-carlo.com, monte-carlocasino.com, e-casinomontecarlo.com, casinomontecarlo.org, casinomontecarlo.net.
 Britannia: montecarlocasinos.net, the-casinomontecarlo.com, the montecarlocasino.com.
Accordingly, the plaintiff companies must be enjoined from registering and using domain names containing the trademark "Casino de Monte Carlo" or its foreign equivalents in United States commerce and from using the mark on the Internet in United States commerce. Plaintiffs also must transfer the registrar certificates to defendant SBM for the above-mentioned domain names. Furthermore, summary judgment should be awarded for plaintiffs and against defendant for the following ten domain names:
 montecarlogambling.net, montecarlogames.com, montecarlogames.net, montecarlojackpot.com, montecarlojackpot.net, livemonacocasino.com, monacogaming.com, monacogaming.net, montecarlogambling.com, and monacocasinos.com.
Accordingly, plaintiffs may retain the certificates for these domain names.
An appropriate order will issue.

Graphic 1

*493 Graphic 2

NOTES
[1] This Revised Memorandum Opinion supersedes the original Memorandum Opinion issued February 27, 2002, which was vacated to allow the parties to address various issues raised in plaintiffs' pleadings seeking a stay of the judgment. The Court elected to construe these pleadings as a motion for reconsideration and allowed the parties to file additional memoranda. The parties complied and this Revised Memorandum Opinion resolves these issues on the basis of the record as it existed at the time the original Memorandum Opinion issued. Plaintiffs filed a motion to strike, objecting to defendant's attempt to supplement the record, which motion was granted. See International Bancorp, L.L.C. v. Societe Des Bains De Mer Et Du Cercle Des Etrangers A Monaco, Civil Action No. 01-115-A (E.D.Va. Mar. 26, 2002) (order).
[2] The Principality of Monaco is comprised of four geographic regions, known as "quarters" or "quartiers": Fonticllie, La Condamine, Monaco-Ville, and Monte-Carlo.
[3] In its pleadings, SBM refers to its protected mark as "Casino de Monte Carlo," whereas SBM's application to the U.S. Patent and Trademark Office describes the mark as "Casino de Monte-Carlo." The addition of the hyphen is of no legal consequence, for under the doctrine of foreign equivalents, these two marks are treated as identical. See Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1531 (4th Cir.1984).
[4] These domain names include montecarlore-sort.com, casino-monte-carlo.com, www.sbm. mc/casino.
[5] For example, articles discussing SBM's Casino de Monte Carlo appeared in the following magazines: Avenue (Feb.1999, Feb. 2001), Diversion (May 1998), Home & Away (Jan.-Feb.1998), New Jersey Savvy Living (May 1998), Palm Beach Illustrated (Dec.2000), Robb Report (Mar.1999, May 2000), Sports Illustrated (1997), Successful Meetings (Oct. 1999, Dec. 1999), Town & Country (Dec.1999, May 2000), Travel & Leisure (Oct.1999). Similarly, articles about the Casino de Monte Carlo appear in the following newspapers: Arizona Republic (Dec. 14, 1997, Feb. 8, 1998, July 22, 1999), Brooklyn Daily Eagle & Daily Bulletin (Dec. 7, 1999), Buffalo News (Aug. 3, 1997), Chicago Tribune (Feb. 22, 1998), Daily News (New York) (Feb. 9, 1997), Herald-Palladium (St.Joseph, Mich.) (Nov. 23, 1997), Jewish Journal (Palm Beach, Fla.) (Feb. 1, 2000), Journal Star (Peoria, Ill.) (Jan. 30, 2000), Miami Herald (Nov. 23, 1997, Jan. 21, 2001), Milwaukee Journal Sentinel (Mar. 1, 1998), New York Times (Mar. 14, 1997, Apr. 25, 2000), Orange County Register (Jan. 25, 1998), Post Register (Idaho Falls, Idaho) (Dec. 6, 1999), St. Paul Pioneer Press (Dec. 28, 1997), San Bernardino County Sun (Apr. 16, 2000).
[6] The existence of this reservations service is reflected in the numerous of SBM's brochures submitted in the record prior to the original summary judgment motion.
[7] For instance, the Las Vegas Monte Carlo Resort & Casino offers Internet gambling. There are other examples of non-SBM-affiliated businesses offering gambling services while using the geographic term "Monte Carlo." See, e.g, Holmes v. Curtis Publishing Co., 303 F.Supp. 522, 523 (D.S.C.1969) (discussing a gambling establishment named "Monte Carlo"); Monte Carlo Parties, Ltd. v. Webb, 253 Ga. 508, 322 S.E.2d 246 (1984) (discussing a business that held "Monte Carlo gambling parties").
[8] International Bancorp registered the following disputed domain names: montecarlocasino.net, montecarlocasino.org, montecarlo-casino.com, monte-carlo-casino.com, casinosmontecarlo.com, and e-montecarlocasino.com.
[9] International Services registered the following disputed domain names: casinode-montecarlo.net, casino-montecarlo.net, casinomonte-carlo.net, casinomonte-carlo.org, casinosmontecarlo.net, casinosmontecarlo.org, casinomontecarloonline.com, ecasinomontecarlo.com, ecasinomontecarlo.net, emontecarlocasino.com, emontecarlocasino.net, e-casinomontecarlo.net, e-montecarlocasino.net, lemontecarlocasino.net, monte-carlocasino.net, montecarlocasinoonline.com, montecarlocasinoonline.net, montecarloonlinecasino.com, montecarloonlinecasino.net, montecarlogambling.net, montecarlogames.com, montecarlogames.net, montecarlojackpot.com, montecarlojackpot.net, sexycasinomontecarlo.com, sexymontecarlocasino.com, sexymontecarlocasino.net, webcasinomontecarlo.com, livemonacocasino.com, monacogaming.com, and monacogaming.net.
[10] International Lotteries registered the following disputed domain names: casinomontecarlo.com, montecarlocasinos.com, lecasinodemontecarlo.com, casinodemontecarlo.com, lemontecarlocasino.com, lecasinomontecarlo.com, casinomonte-carlo.com, monte-carlocasino.com, montecarlogambling.com, c-casinomontecarlo.com, casinomontecarlo.org, and casinomontecarlo.net.
[11] Britannia registered the following disputed domain names: monacocasinos.com, montecarlocasinos.net, thecasinomontecarlo.com, and themontecarlocasino.com.
[12] Many of these websites relate to gambling and the domain names associated with them contain a geographic designation. Examples include Americanjackpot.com, Americancasino.com, Americancraps.com, Asiancasino.com, atlanticcitycasino.com, australiancasino.com, britishcasino.com, canadiancasino.com, lasvegascasino.com, and chinacasino.com.
[13] See attached graphic 1.
[14] See attached graphic 2.
[15] Under WIPO procedures, the registrar of a domain name must implement any transfer decision of the panel, unless the losing registrant commences court proceedings against the WIPO complainant within ten days.
[16] Worth noting here is that the result reached in the WIPO proceeding is neither admissible nor entitled to any deference on the liability issues presented in this suit. Review here must be de novo and independent of any WIPO panel conclusion. See, e.g., Parisi v. Netlearning, Inc., 139 F.Supp.2d 745, 752 (E.D.Va.2001).
[17] See America Online, Inc. v. Huang, 106 F.Supp.2d 848, 855-60 (E.D.Va.2000); see also Heathmount A.E. Corp. v. Technodome.com, 106 F.Supp.2d 860, 865-66 (E.D.Va.2000); Cybersell, Inc. v. Cybersell, Inc., 130 F.3d 414, 418-20 (9th Cir.1997); Rannoch, Inc. v. Rannoch Corp., 52 F.Supp.2d 681, 685 (E.D.Va.1999). There is no evidence in the record that any of the plaintiff companies' hard drives or servers are located in Virginia, nor is there any indication that Levy offered to sell any of the disputed domain names to anyone in Virginia. See Panavision International, L.P. v. Toeppen, 141 F.3d 1316, 1322-24 (9th Cir.1998) (holding that a person who registers a trademark as a domain name and offers that domain name for sale directly to the trademark owner may be subject to personal jurisdiction in the trademark owner's domicile).
[18] See Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 337-38, 45 S.Ct. 250, 69 L.Ed. 634 (1925) (holding that the substantive law of the state of incorporation does not affect the issue of personal jurisdiction in the forum state).

For purposes of determining liability, rather than jurisdiction, Virginia employs a different rule, requiring application of the domiciliary state's law. See Morrow v. Vaughan-Bassett Furniture Co., 173 Va. 417, 4 S.E.2d 399, 401 (1939) ("[T]he liability of a stockholder in a foreign corporation for its debts is to be determined by the laws of the State of the corporation.") (emphasis added).
[19] See, e.g., De Castro v. Sanifill, Inc., 198 F.3d 282, 284 (1st Cir.1999); Ranger Enterprises, Inc. v. Leen & Associates, Inc., 163 F.3d 607, 1998 WL 668380 (9th Cir.1998); Ten Mile Indus. Park v. Western Plains Service Corp., 810 F.2d 1518, 1527 (10th Cir.1987); Stuart v. Spademan, 772 F.2d 1185, 1197 (5th Cir.1985). See also Lea Brilmayer & Kathleen Paisley, Personal Jurisdiction and Substantive Legal Relations: Corporations, Conspiracies, and Agency, 74 Cal. L.Rev. 1 (1986).
[20] See, e.g., DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681, 683 (4th Cir.1976), discussing South Carolina's law of piercing the corporate veil, which does not require a showing of culpable conduct by the alleged alter ego.
[21] It is undisputed that U.S. trademark law protects foreign nationals who own marks protectable under American law. See Larsen v. Terk Technologies Corp., 151 F.3d 140, 146 (4th Cir.1998).
[22] All but ten of the fifty-three domain names at issue use the term "Casino de Monte Carlo" in some way. But it is clear from the record that the following domain names constitute no use of SBM's mark and involve, instead, the use of only the geographic term "Monte Carlo." These ten names and their registrants are as follows: International Services's domain names; montecarlogambling.net montecarlogames.com, montecarlogames.net, montecarlojackpot.com, montecarlojackpot.net, livemonacocasino.com, monacogaming.com, and monacogaming.net; International Lotteries's domain name montecarlogambling.com; and Britannia's domain name monacocasinos.com.
[23] United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc., 128 F.3d 86, 92-93 (2d Cir.1997); see also Cable News Network L.P., L.L.L.P. v. Cnnews.com, 177 F.Supp.2d 506, 517 (E.D.Va.2001).
[24] See Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1194 (11th Cir.2001) ("Because Congress' authority under the Commerce Clause extends to activity that substantially affects interstate commerce, the Lanham Act's definition of commerce is concomitantly broad in scope: all commerce which may lawfully be regulated by Congress.") (internal citations and quotation marks omitted).
[25] Although the amount of advertising shown in this case seems far greater than the advertising shown in Buti, see supra Part I.A, this distinction is of no avail in the Second Circuit as that court had made clear that mere advertising, however extensive, is not enough to satisfy the Lanham Act's commerce requirement. See Morningside Group Ltd. v. Morningside Capital Group, L.L.C., 182 F.3d 133, 138 (2d Cir.1999). While it is unclear whether the Fourth Circuit would follow the Second Circuit in this regard, that forecast need not be made here because this is not a mere advertising case.
[26] "Casino de Monte Carlo" is a composite mark, and is entitled to protection under 15 U.S.C. § 1125(a) regardless of whether each word in the combination is descriptive. See Banff, Ltd. v. Federated Dept. Stores, Inc., 841 F.2d 486, 489 (2d Cir.1988); see also California Cooler, Inc. v. Loretto Winery, Ltd., 774 F.2d 1451, 1455 (9th Cir.1985) ("The commercial impression of a trademark is derived from [the composite mark] as a whole, not from its elements separated and concealed in detail. Thus, a composite may become a distinguishing mark even though its components individually cannot.").
[27] Fourth Circuit precedent instructs that determining secondary meaning is a judicial function. See Pinehurst, 148 F.3d at 422.
[28] See Perini, 915 F.2d at 125.
[29] Larsen, 151 F.3d at 148-49 (discussing and citing with approval Osem Food Industries v. Sherwood Foods, 917 F.2d 161 (4th Cir.1990) and M. Kramer Mfg. Co., Inc. v. Andrews, 783 F.2d 421 (4th Cir.1986)). See also Rubbermaid Commercial Products, Inc. v. Contico Intern., Inc., 836 F.Supp. 1247, 1261 (W.D.Va.1993). In Larsen, the defendant manufactured and sold pirated, counterfeited products using the plaintiff's mark. See Larsen, 151 F.3d at 144-45. In Osem, the defendant admitted to copying intentionally and directly copying the plaintiff's trade dress. See Osem, 917 F.2d at 163 n. 3. Finally, in Kramer, the alleged infringer directly copied the plaintiff's video game program. See Kramer, 783 F.2d at 427-28.
[30] The use and registration of the following ten domain names does not constitute use of the "Casino de Monte Carlo" mark: montecarlogambling.net, montecarlogames.com, montecarlogames.net, montecarlojackpot.com, montecarlojackpot.net, livemonacocasino.com, monacogaming.com, monacogaming.net, montecarlogambling.com, and monacocasinos.com.
[31] There is evidence in the record of both U.S. and international businesses using terms such as "Monte Carlo Casino."
[32] See supra note 31.
[33] It is clear from the record that the ten domain names which were deemed to have not been "use" of the term "Casino de Monte Carlo," see note 26, also have no likelihood of confusion with the mark, either. These excluded domain names are: montecarlogambling.net, montecarlogames.com, montecarlogames.net, montecarlojackpot.com, montecarlojackpot.net, livemonacocasino.com, monacogarning.com, monacogaming.net, montecarlogambling.com, and monacocasinos.com.
[34] See also Osem, 917 F.2d at 165 ("It would be inconsistent not to require one who tries to deceive customers to prove they had not been deceived."); Rubbermaid, 836 F.Supp. at 1261 (presumption in favor of likelihood of confusion where there is intentional copying).
[35] See supra pp. 19-20.
[36] Moreover, this record appears to be too sparse to support a finding of fame of the mark, another necessary element of a trademark dilution claim. See 15 U.S.C. § 1125(c).
[37] The factors are:

(1) the trademark or other intellectual property rights of the registrant, if any, in the domain name;
(2) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
(3) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
(4) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
(5) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark;
(6) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having intent to use, the domain name in the bona fide offering of any goods or services or the person's prior conduct indicating a pattern of such conduct;
(7) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
(8) the person's registration or acquisition of multiple domain names that the person knows are identical or confusingly similar to the distinctive marks of others or are dilutive of the famous marks of others; and
(9) the extent to which the mark incorporated in the domain name is distinctive and famous within the meaning of the Federal Trademark Dilution Act.
See 15 U.S.C. § 1125(d)(1)(B)(i).
[38] See Cnnews.com, 177 F.Supp.2d at 524 n. 41. ("For example, this factor would not support a finding of bad faith for an individual with the last name `Ford,' who registers or uses the domain name `ford.com.'").
[39] There is evidence, however, that the plaintiff companies are affiliated or have verbal agreements with two foreign entities: Casino Monte Carlo, Inc., a Panamanian corporation, and Casino Monte Carlo, NV, a company formed in the Netherlands Antilles. These facts provide little if any support for plaintiffs' position because there is no evidence that these allegedly affiliated companies have any legitimate rights to the mark "Casino de Monte Carlo" in this country or in any other country. Were it sufficient for a putative infringer to defeat a bad faith determination simply by establishing an affiliate bearing the infringing name in a remote, obscure nation, bad faith never could be proven. While there may be cases where a putative infringer's having an affiliate that has the name of the disputed domain name could defeat an inference of bad faith, this is not one of those cases.
[40] See 15 U.S.C. § 1125(d)(1)(B)(i)(III).
[41] See Cnnews.com, 177 F.Supp.2d at 525.
[42] The case of Intermatic, Inc. v. Toeppen, 947 F.Supp. 1227 (N.D.Ill.1996) illustrates the practice of warehousing. There, the defendant registered over 200 domain names, including deltaairlines.com, britishairways.com, crateandbarrel.com, and ussteel.com.
[43] Both the United States and Monaco are signatories to the treaty. See 24 U.S.T. 2140.
[44] See also International Café, S.A.L. v. Hard Rock Café Intern. (U.S.A.), Inc., 252 F.3d 1274, 1277-78 (11th Cir.2001); Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633, 644 (2d Cir.1956); L'Aiglon Apparel v. Lana Lobell, Inc., 214 F.2d 649, 652-54 (3d Cir.1954).
[45] Virginia choice of law rules apply here. See ITCO Corp. v. Michelin Tire Corp., Commercial Div., 722 F.2d 42, 49 n. 11 (4th Cir. 1983) (holding that in federal question cases, a district court entertaining pendent state claims should follow the choice of law rules of the forum state, citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)); Jones v. R.S. Jones and Assoc., Inc., 246 Va. 3, 431 S.E.2d 33, 34 (1993) (holding that Virginia applies the lex loci delicti, the law of the place of the wrong); Diaz Vicente v. Obenauer, 736 F.Supp. 679, 690 (E.D.Va.1990) ("The rule of lex loci delicti is well-settled in Virginia; the place of the injury supplies the governing law in tort actions."). Because the allegedly infringing domain names have their "situs" in Virginia, see 15 U.S.C. § 1125(d)(2)(C), Virginia is the place of the alleged injury to SBM's mark.
[46] Virginia law does not recognize the burden-shifting scheme adopted by the Fourth Circuit in Larsen and related cases. See supra Part IV.
[47] See McCarthy § 2:14 (stating unequivocally that "[t]rademarks are property rights").
[48] See U.S.Ct. of App. 4th Cir. Rule 36(c).
[49] It is, therefore, unnecessary to reach the question whether the statute of limitations tolled while the matter was pending before the WIPO arbitration panel. Although this specific issue has not been addressed directly, the Fourth Circuit has held that it is proper to toll the statute of limitations in similar circumstances. See, e.g., Crawford v. Air Line Pilots Ass'n Intl'l, 870 F.2d 155, 159 (4th Cir. 1989) (holding that the statute of limitations tolled during an arbitration period); Trent v. Bolger, 837 F.2d 657, 659-60 (4th Cir.1988) (holding that the statute of limitations tolled during the period of an administrative appeal). Thus, it follows that the statute of limitations tolled while the matter was pending before the WIPO arbitration panel.
[50] Nor is the equitable relief sought in this claim barred by laches. See Lyons, 243 F.3d at 799 (holding that "when federal courts, in the exercise of their equitable power, consider laches, they are guided by the limitations period that they would borrow for actions at law and presume that if an equitable claim is brought within the limitations period, it will not be barred by laches"). In any event, there is no persuasive evidence of laches in this record.
[51] Section 1117(d) provides that "[i]n a case involving a violation of section 1125(d)(1) of this title, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just."

"It is well-established that anyone who unlawfully registers, traffics in, or uses a domain name after the ACPA's date of enactment, November 29, 1999, may be liable for monetary damages under 15 U.S.C. § 1117(d) and may be subject to having the domain name transferred to the owner of the mark or canceled under 15 U.S.C. § 1125(d)(2)(D)(i)." See Virtual Works, Inc. v. Volkswagen of America, Inc., 238 F.3d 264, 268 (4th Cir.2001). While many of the disputed domain names were registered before 1999, all of them were used or trafficked in after the ACPA was enacted. Thus, damages may be awarded for each of the disputed domain names.
[52] See, e.g., Aztar Corp. v. MGM Casino, 2001 WL 939070, * 6 (E.D.Va.2001) (finding $100,000 in statutory damages for use of one domain name when defendant's willful and bad faith infringement and dilution was especially deceptive and continued even after plaintiff put defendant on notice of the infringing conduct); Electronics Boutique Holdings Corp. v. Zuccarini, 2000 WL 1622760, * 8 (E.D.Pa.2000) (finding $100,000 in statutory damages when defendant's conduct was egregious and he "boldly thumb[ed] his nose at the rulings of this court and the laws of our country").
[53] In this circuit, it is well-established that a case is exceptional where the infringer's conduct was "malicious, fraudulent, willful or deliberate in nature." Doughney, 263 F.3d at 370 (quoting Scotch Whisky Ass'n, 958 F.2d at 599). Thus, a prevailing trademark holder must "show that the defendant acted in bad faith." Doughney, 263 F.3d at 370. Yet, "a bad faith finding under the ACPA does not compel a finding of malicious, fraudulent, willful or deliberate behavior under § 1117." Id. Thus, it is within the discretion of the district court to find that even if a party violates the ACPA (and has, by definition, acted in bad faith), that party might not have acted "with the level of malicious, fraudulent, willful or deliberate behavior necessary for an award of attorney fees." Id.
[54] See Aztar Corp., 2001 WL 939070, *6; Electronics Boutique Holdings, 2000 WL 1622760, *8.
[55] See Shields v. Zuccarini, 254 F.3d 476, 487 (3d Cir.2001) (affirming an award of $10,000 per domain name plus attorneys' fees); Victoria's Cyber Secret Ltd. Partnership v. V Secret Catalogue, Inc., 161 F.Supp.2d 1339, 1356 (S.D.Fla.2001) (same); National Collegiate Athletic Ass'n v. BBF International, 2001 WL 841050, *2 (E.D.Va.2001) (same); United Greeks, Inc. v. Klein, 2000 WL 554196, *1 (N.D.N.Y.2000) (awarding $2,000 in statutory damages and attorneys' fees for "exceptional" conduct).
[56] Cf. E. & J. Gallo Winery v. Spider Webs Ltd., 129 F.Supp.2d 1033, 1048 (S.D.Tex. 2001) (awarding $25,000 per domain name but no attorneys' fees).
[57] See supra Part V.
[58] The plaintiff companies are responsible for the following amounts based on their ownership of their domain names: International Bancorp-$10,000 (for montecarlocasino.net and five other domain names); International Services-$23,000 (for twenty-three domain names); International Lotteries-$15,000 (for casinomontecarlo.com and ten other domain names); Britannia-$3,000 (for three domain names).