NOS. 4-97-0385, 4-97-0386 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

MARGE CAMERON, Individually and as ) Appeal from

Special Administrator of the        ) Circuit Court of

Estate of J. Bernard Latta, Deceased, ) McLean County

Plaintiff-Appellee,           ) No. 95L112

          v.     (No. 4-97-0385)      )

OWENS-CORNING FIBERGLAS CORPORATION, )

et al., )

Defendants, )

          and                       )

CHARTER PLC,                        )

          Defendant-Appellant.      ) 

-------------------------------------- )

ELEANOR PRICE, Individually and as )

Special Administrator of the Estate )

of Floyd Price, Deceased, )

Plaintiff-Appellee, )

v.     (No. 4-97-0386) ) No. 95L50

UNARCO INDUSTRIES, INC., et al., )

Defendants, )

and ) Honorable

CHARTER PLC, ) Ronald C. Dozier,

Defendant-Appellant. ) Judge Presiding.

_________________________________________________________________

JUSTICE McCULLOUGH delivered the opinion of the court:

In these consolidated appeals, this court allowed the petition of defendant Charter PLC (Charter) for leave to appeal the denial of its motions to dismiss for lack of personal jurisdiction.  166 Ill. 2d R. 306(a)(3).  In No. 4-97-0385, the plaintiff is Marge Cameron, individually and as special administrator of the estate of J. Bernard Latta, deceased.  In No. 4-97-0386, the plaintiff is Eleanor Price, individually and as special administrator of the estate of Floyd J. Price, deceased.  Other named defendants are not involved in this appeal.  The issues are whether (1) the trial court erred in ruling that 
in
 
personam
 jurisdic­tion over Char­ter can be based on activities of alleged coconspirators; and (2) Charter did not have sufficient contacts with Illinois on which to base 
in
 
personam
 jurisdiction.  We affirm.

On March 24, 1995, Cameron filed her complaint against multiple defendants in this asbestos case.  Her complaint alleged a conspiracy among the defendants and others.  Count I was a wrongful death action, and count II sought damages for Latta's injuries prior to death.  Summons and complaint were served on Charter on April 5, 1995, in Jefferson County, Illinois.

On May 8, 1995, Charter filed a special and limited appearance and a motion to quash service of process.  That motion, and supporting affidavits, indicated (1) Charter was a corporation organized under the laws of the United Kingdom; (2) plaintiff served "Charter Consolidated PLC, National Mine Service, Route 37 N. Mt Vernon, Illinois," at a warehouse facility of National Mine Service, Inc.; (3) prior to March 8, 1995, defendant indirectly owned shares of National Mine Service, but National Mine Service sold all its assets to a subsidiary of Marmon Corporation, including the warehouse in Mt. Vernon; (4) these assets were later transferred to National Mine Service, Inc., another Marmon subsidiary; (5) Charter had no affiliation with or interest in Marmon or National Mine Service, Inc.; (6) Charter indirectly continues to own shares of National Mine Service Company, which had changed its name to Distribution and Mining Equipment Company and is dormant and conducts no business in Illinois or anyplace else; and (7) Marmon, National Mine Service, Inc., and their employees are not registered agents of Charter.  The trial court allowed plaintiff to depose Charter's affiants without affecting Charter's special and limited appearance.

On August 8, 1995, plaintiff Cameron served an alias summons and complaint on Distribution Mining and Equipment Company through CT Corporation System, Chicago, Illinois.  Charter moved to quash the alias summons on the ground that Charter and Distribu­tion Mining are separate companies; CT Corporation System is not a regis­tered agent of Charter; and no officer, director, or employee of Distribution Mining and Equipment Company is an officer, director, or employee of Charter.  The motion was supported by affidavits.  The parties filed numerous documents and depositions.  On October 18, 1996, the motion to quash was denied, and Charter's special and limited appearance was overruled after the trial court found that service was proper based on the relationship of Fred O. Clayton to both Charter and Distribution Mining and Equipment Company.  

On November 14, 1996, Charter again filed a special and limited appearance and a motion to dismiss for lack of personal jurisdiction.  Plaintiff Cameron moved to strike Charter's motion on the ground that it had waived the right to challenge personal jurisdic­tion because of the prior motions and rulings on the motion to quash service.  Plaintiff's motion was denied.  On April 28, 1997, the trial court denied Charter's motion to dismiss the complaint for lack of jurisdiction.  This appeal, No. 4-97-0385, followed.

On February 23, 1995, Price filed a complaint alleging multiple counts.  Charter was named a defendant in counts X, XI, and XII.  Count X was a conspiracy in a wrongful death action, count XI sought damages for injuries to Floyd Price prior to his death, and count XII was for loss of consortium.  The procedural history of this case is essentially the same as in Cameron.

The allegations of the counts of the complaints in both cases naming Charter as a defendant are also substantially the same.  The complaints name Johns-Manville Corporation; Johns-Manville Sales Company; UNARCO Industries, Inc.; and Raymark Industries, Inc.; or their corporate predecessors, as coconspira­tors of Charter and the other named defendants.  The complaints alleged the conspirators (1) were active in the asbestos business for many years, had knowledge of manufacturing operations using asbestos, and had actual knowledge of asbestos disease and death among workers exposed to asbestos as early as the 1930s; (2) knew workers were ignorant of the hazardous propensities of asbestos; (3) knew asbestos was inherently dangerous; (4) had employees who were exposed to asbestos dust and had a duty to provide a safe workplace or to warn of the hazards; (5) knew that, if they adequately warned their employees and others whose work brought them into contact with the asbestos, the publication would cause workers to leave asbestos-using industries, reducing sales and uses of asbestos; and (6) knowingly conspired and agreed among them­selves to 

"a) positively assert in a manner not war­rant­ed by the information possessed by the conspirators, that which was and is not true, to wit, that it was safe for people to work with and in closed [
sic
] prox­im­ity to asbestos and asbestos[-]con­taining materi­als; [and]

b) suppress information about the harmful effects of asbestos, including medical and scientific data, causing workers to be and to remain ignorant of that infor­mation."

The complaints alleged, 
e.g.
, that, in furtherance of the conspira­cy, the conspirators did one or more of the following acts:

"a) sold asbestos which was used at the plant without warning of the hazards known to the seller;

b) refused to warn its own employees about the hazards of asbestos known to it, including the refusal of Unarco to warn its employee, J. Bernard Latta, about the hazards of asbestos known to Unarco;

c) edited and altered the reports and drafts of publications initially prepared by Dr. Lanza concerning the hazards of asbestos during the 1930's;

d) agreed in writing not to disclose the results of research on the effects of asbestos upon health unless the results suited their interests;

e) obtained an agreement in the 1930's from the editors of 
ASBESTOS
, the only trade magazine devoted exclusively to asbestos, that the magazine would never publish articles on the fact that exposure to asbestos caused disease, and sustained this agreement into the 1970's;

f) suppressed the dissemination of a report by Dr. Gardner in 1943 which was very critical of the concept that there was a safe level of asbestos exposure;

g) through their control of the Asbestos Textile Institute (ATI), defeated further study of the health of workers when Wil­liam Hemeon graphically demonstrated the need for such study and dissemination of information in the 1940's; [and]

h) edited and altered the reports and drafts of publications regarding asbestos and health initially prepared by Dr. Vorwald during 1948-1951."

Plaintiffs argue that the challenge to the personal jurisdiction as been "waived" since it was not raised at the time of the first special and limited appearance.  Section 2-301 of the Code of Civil Procedure (Code) states, in relevant part:

"(a) Prior to filing any other pleading or motion, a special appearance may be made either in person or by attorney for the pur­pose of objecting to the jurisdiction of the court over the person of the defendant.  A special appearance may be made as to an entire proceeding or as to any cause of action in­volved therein.  Every appearance, prior to judgment, not in compliance with the foregoing is a general appearance.

(b) If the reasons for objection are not apparent from the papers on file in the case, the special appearance shall be supported by affidavit setting forth the reasons.  In ruling upon the objection, the court shall consider all matters apparent from the papers on file in the case, affidavits submitted by any party, and any evidence adduced upon disputed issues of fact.  No determination of any issue of fact in connection with the objection is a determination of the merits of the case or any aspect thereof.  A decision adverse to the objector does not preclude the objector from making any motion or defense which he or she might otherwise have made."  735 ILCS 5/2-301(a), (b) (West 1994).

Plaintiffs argue that "a special appearance" means only one may be filed.  However, the article "a" is generally not used in the singular sense unless that intention is clear from the statutory language.  
Lindley v. Murphy
, 387 Ill. 506, 517, 56 N.E.2d 832, 838 (1944).

Even though that would promote judicial economy, none of the cases cited by plaintiffs stand for that proposition.  
R.W. Sawant & Co. v. Allied Programs Corp.
, 130 Ill. App. 3d 71, 74, 473 N.E.2d 496, 498-99 (1984), held it was proper to file a special and limited appearance on a motion to quash service of summons after the entry of a default judgment.  
Hawes v. Hawes
, 130 Ill. App. 2d 546, 547-49, 263 N.E.2d 625, 626-27 (1970), involved vacating a portion of a divorce decree following the entry of a special and limited appearance to challenge the trial court's jurisdiction.  
Albers v. Martin
, 316 Ill. App. 446, 45 N.E.2d 102, 102-03 (1942) (abstract of op.), is a 
scire
 
facias
 proceeding to revive a judgment, and has been published in abstract form only; such opinions are not to be cited in the briefs of litigants unless the entire text of the abstract opinion is appended to the brief (47 Ill. App. 3d R. 8), which it was not in this instance.

Section 2-301 of the Code provides that a special appearance can be made before filing any other pleading or motion, 
i.e.
, before a general appearance has been made.  A general appearance by a defendant waives any objection to jurisdiction over that person.  
Duncan v. Charles
, 5 Ill. (4 Scam.) 561, 569, (1842).  Since the special appearance challenges jurisdic­tion over the party, it cannot be turned into a general appearance simply because a successive special appear­ance, based on a different ground, is also filed attacking jurisdiction over the same person.  Section 2-301 of the Code does not prohibit succes­sive special appearances as long as a general appearance has not yet been made.

The issue of whether the trial court has personal jurisdiction over Charter is a question of law, which this court considers 
de
 
novo
.  
White v. Ratcliffe
, 285 Ill. App. 3d 758, 764, 674 N.E.2d 906, 911 (1996).  In ruling on an objection to personal jurisdiction, "the court shall consider all matters apparent from the papers on file in the case, affidavits submitted by any party, and any evidence adduced upon disputed issues of fact."  735 ILCS 5/2-301(b) (West 1996).  Since no evidence on disputed facts was adduced in this case, the standard of review is the same as for a section 2-619 motion to dismiss, which may be supported by affida­vits and opposed by counteraffidavits.  See 735 ILCS 5/2-619 (West 1996); 
Kedzie & 103rd Currency Exchange, Inc. v. Hodge
, 156 Ill. 2d 112, 116, 619 N.E.2d 732, 735 (1993).

The Illinois long-arm statute, section 2-209 of the Code, provides in relevant part:

"(a) Any person, whether or not a citi­zen or resident of this State, who in person or through an agent does any of the acts herein­after enumerated, thereby submits such person, and, if an individual, his or her personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts:

***

(2) The commission of a tor­tious act within this State;

* * *

(c) A court may also exercise juris­dic­tion on any other basis now or hereafter permitted by the Illi­nois Constitution and the Constitu­tion of the United States."  735 ILCS 5/2-209(a)(2), (c) (West 1994).

In 
Ores v. Kennedy
, 218 Ill. App. 3d 866, 872, 578 N.E.2d 1139, 1144 (1991), the court stated:

"Pursuant to the amended Illinois long-arm statute and before exercising 
in
 
personam
 jurisdiction, due process requires that a non-resident defendant have certain minimum con­tacts with the forum State such that mainte­nance of the suit there does not offend 'traditional notions of fair play and substan­tial justice.'  (
International Shoe Co. v. Washington
 (1945), 326 U.S. 310, 316, 90 L. Ed. 95, 102, 66 S. Ct. 154, 158.)  Therefore, the following three criteria must be consid­ered to determine whether the court's exercise of jurisdiction over Golden satisfies due pro­cess:  (1) whether the nonresident defen­dant had 'minimum contacts' with the forum State such that he had 'fair warning' that he may be required to defend himself there; (2) wheth­er the action arose out of or relates to the defendant's contacts with the forum; and (3) whether it is reasonable to require the defen­dant to litigate in the forum State.  
Burger King Corp. v. Rudzewicz
 (1985), 471 U.S. 462, 471-78, 85 L. Ed. 2d 528, 540-44, 105 S. Ct. 2174, 2181-85."

Federal standards are the outer limits beyond which the state may not go to acquire jurisdiction over nonresidents, and Illinois courts must look to both the federal standards and the long-arm statute.  
Rollins v. Ellwood
, 141 Ill. 2d 244, 271, 565 N.E.2d 1302, 1314 (1990).  Furthermore, the Illinois Constitution contains its own guarantees of due process (Ill. Const. 1970, art. I, §2), separate and independent from the federal guarantees.  
Rollins
, 141 Ill. 2d at 275, 565 N.E.2d at 1316.

"Jurisdiction is to be asserted only when it is fair, just, and reasonable to require a non­resident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illi­nois or which affect interests located in Illinois.  See 
People ex rel. Mangold v. Flieger
 (1985), 106 Ill. 2d 546, 550."   
Rollins
, 141 Ill. 2d at 275, 565 N.E.2d at  1316.

Charter argues that a conspiracy theory, as a basis for personal jurisdiction, has been held to be invalid.  Charter relies on 
Green v. Advance Ross Electronics Corp.
, 86 Ill. 2d 431, 440-41, 427 N.E.2d 1203, 1208 (1981).  
Green
, however, stated it did not work in that case because Illinois had jurisdiction over one alleged conspirator only because that individual elected to come to Illinois to sue the defendants.  That fact did not indicate that any of the tortious acts he was charged with performing in common with his father satisfied the long-arm statute.  The Illinois Supreme Court went on to state that, for all coconspirators to be subject to Illinois jurisdiction, one coconspirator must have committed a tortious act within Illinois as agent for the other co-conspira­tors.  
Green
 did note that the conspiracy theory of jurisdiction had been questioned in 
Chromium Industries, Inc. v. Mirror Polishing & Plating Co.
, 448 F. Supp. 544, 552 (N.D. Ill. 1978).  
Ores
 stated that the legislative amendment of section 2-209 of the Code to add what is now subsection (c) effectively overruled the language in 
Green
 (later restated in 
Rollins
) to the effect that a statute worded such as that in Illinois should have a fixed meaning.  
Ores
, 218 Ill. App. 3d at 872, 578 N.E.2d at 1144.  The underlying incident and the filing of the original complaint in 
Rollins
 occurred in 1986.  The relevant amendment to section 2-209 was effective November 23, 1987.  735 ILCS Ann. 5/2-209, Historical and Statutory Notes (Smith-Hurd 1992).  Plaintiffs suggest that the "any other basis" language in section 2-209(c) of the Code is a basis for obtaining jurisdic­tion over Charter by using it as a vehicle for incorporat­ing the conspira­cy theory of jurisdiction into Illinois law.

In 
Textor v. Board of Regents of Northern Illinois University
, 711 F.2d 1387, 1392-93 (7th Cir. 1983), the court considered the Illinois long-arm statute.  The complaint alleged the defendants (universi­ties affiliated with the Mid-America Confer­ence) conspired to discriminate against women's athletics in violation of the federal constitution and statutes and in so doing, engaged in conferences, meetings, and discussions in De Kalb, Illinois, at which directives and requests were issued regarding women's athletics.  In 
Textor
, the seventh circuit applied the conspiracy theory of personal jurisdic­tion as a "time-honored notion."  

Charter points out that the conspiracy jurisdiction theory has been criticized for merging otherwise distinct questions of jurisdiction and substantive liability.  In 
Adcock v. Brakegate, Ltd.
, 164 Ill. 2d 54, 62-63, 645 N.E.2d 888, 894, (1994), the Illinois Supreme Court discussed the extension of liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's acts by way of a theory of civil conspiracy, and set out the elements for establishing a civil conspiracy.  The Illinois long-arm statute encompasses the conspiracy theory of jurisdiction.

Charter further argues that the complaints in these cases fail to allege the existence of conspiracy with particularity and they especially do not allege agency.  For this analysis, it is important to note that the agreement, although a necessary element in civil conspiracy, is not itself a tort.  There must be some tortious act or acts performed in furtherance of the agreement.  
Adcock
, 164 Ill. 2d at 62-63, 645 N.E.2d at 894.  Although defendant may contest whether it is responsible for an act or omission causing an injury in Illinois or whether its contacts with the State were sufficient to satisfy due process, it may not contest whether the conduct was in fact tortious.  3 R. Michael, Illinois Practice §6.5, at 68 (1989) (Civil Procedure Before Trial).  Whether plaintiff sufficiently alleged a cause of action is properly addressed in a motion to dismiss pursuant to section 2-615 of the Code.  735 ILCS 5/2-615 (West 1996).

In the context of a motion to dismiss for failure to state a cause of action, bare allega­tions of conspira­cy are insuffi­cient to plead conspira­cy as a matter of substantive liability.  
Hume & Liechty Veterinary Associates v. Hodes
, 259 Ill. App. 3d 367, 369, 632 N.E.2d 46, 48 (1994).  Charter argues that is also true for a conspiracy theory of personal jurisdiction.  Although the complaints alleged no facts as to how the conspiracy came about, other than that the named conspirators "conspired," the allegation is sufficient to overcome a challenge to personal jurisdiction.  

Charter relies on the unrebutted affidavit of Peter Thwaite, Charter's secretary, filed in support of Charter's motion to dismiss for lack of personal jurisdiction.  That affidavit stated that (1) Charter has never mined, processed, sold, or distributed asbestos or asbestos-containing products or engaged in any aspect of the asbestos business; (2) it has not conspired with any party to distribute asbestos or asbestos-containing products; (3) Charter conducts no business in Illinois; has no certificate of authority to transact business in Illinois; has never entered into a contract to be performed in Illinois; has never maintained an office in Illinois; has never owned real estate in Illinois; has no director, officer or employee who ever resided in Illinois; never maintained a post office box or telephone in Illinois; has no registered agent for service of process in Illinois; has never had a bank account in Illinois; has never advertised in Illinois; and has never paid taxes or franchise fees or commenced law suits in Illinois; (4) "Charter plc" is an investment holding company which, in 1993, acquired all outstanding shares of Charter Consolidated P.L.C., which was incorporated in the United Kingdom in 1964; (5) Cape PLC, formerly Cape Industries PLC, is a holding company incorporated in 1983, and it holds shares in companies engaged in, among other things, industrial construction and manufacturing of building products; (6) until June 1979, Cape indirectly owned companies that were engaged in mining and marketing asbestos; (7) in June 1979 those assets were sold to a company unaffiliated with Cape or Charter; (8) in 1965, Charter acquired the Central Mining and Investment Corporation Limited, which indirectly owned 16.86% of Cape through a subsidiary; (9) Charter, through subsidiaries, acquired an increasingly larger share of Cape over the years until it owned as much as 67.3%; (10) Charter sold all shares of Cape as of July 18, 1996; (11) Charter did nominate directors (never more than three) to Cape's board (7 to 13 members between 1969 through 1996) and no Charter nominee or employee was an officer of Cape or responsible for management; (12) in 1969, the managing director and chairman of Cape joined Charter's board, and he left in 1979; (13) no member of Cape's management has been on Charter's board; (14) the boards of Cape and Charter had always acted separately, with board meetings held at different places and times; (15) Cape and Charter always engaged in entirely different businesses with completely separate operations and Charter never participated in any management or operation decisions of Cape; (16) Charter never owned any share in Cape subsidiaries, was not involved in their operation, never had officers in common with one exception, held separate shareholder meetings, and maintained separate offices; had separate bank accounts, books, and records; and no employees of Charter were transferred to Cape or Cape's subsidiaries, and no employees of these companies were transferred to Charter; (17) Charter never provided financing to any Cape subsidiary, including those engaged in the mining and marketing of asbestos; (18) Charter has never been consulted by Cape or its subsidiaries concerning the mining, marketing, prospecting, or sale of asbestos, or the making of long-term policy on such matters; and (19) Charter has never been consulted by any Cape subsidiary about advertising, promotion, customers, development, supply, distribution, capital expenditures, prices, or personnel. The concluding paragraph of the affidavit states:

"24.  As set forth above, Charter has never engaged in any aspect of the asbestos business, nor has Charter participated in the asbestos business that at one time was carried on by subsidiaries of Cape.  Accordingly, plaintiff's allegation that Charter somehow was part of a conspiracy to distribute asbes­tos and to suppress medical research regarding asbestos is incorrect and without any basis in fact.  Charter never conspired with Cape or anyone else, nor has Cape or any of the other defendants named in the complaint ever acted as an agent of Charter."

Well-alleged facts in an affidavit regarding jurisdic­tion, which are not contradicted by counteraffidavit, are taken as true notwithstanding the existence of contrary averments in the adverse party's pleadings.  
Kutner v. DeMassa
, 96 Ill. App. 3d 243, 248, 421 N.E.2d 231, 235 (1981).  In 
Kutner
, the counteraffidavits were determined to be insufficient.  Here, plaintiffs filed no counteraffidavits alleging evidentiary facts upon which the conclusions of agency or conspiracy are based.  Thwaite's state­ments that the allegations of the complaint "are untrue and without foundation," and that plaintiff's arguments "would be an incorrect interpretation of the relationship among Charter, Cape, and Cape's former subsidiaries," are mere conclusions, not well-alleged facts. Thwaite's affidavit concedes that until 1979 Cape Industries PLC indirectly owned companies that were engaged in the mining and marketing of asbestos, that after 1969 Charter owned a majority interest in Cape, that Charter placed three directors on Cape's Board, that Cape's managing director and chairman was a member of Charter's board, and that Charter and Cape filed consolidated tax returns.  Thwaite's affidavit does not refute, except in conclusory fashion, the allegations of the complaint that for many years those in the asbestos industry knew of the dangers of asbestos, yet positively asserted that asbestos was safe and suppressed informa­tion about the harmful effects of asbestos.

In 
Mohn v. International Vermiculite Co.
, 147 Ill. App. 3d 717, 718-23, 498 N.E.2d 375, 375-79 (1986), the plaintiff's action against Charter was dismissed for lack of personal jurisdic­tion.  The nature of Charter's relation­ship to Cape was also discussed in that case.  The trial court found Charter was not Cape's alter ego, declined to pierce the corporate veil, and refused to apply collateral estoppel against Charter utilizing a Pennsylvania case.  This court affirmed the order of the trial court.  However, this court's consideration in 
Mohn
 was limited to the issue of the collateral-estoppel effect of a foreign judgment, an issue not raised in this case.

Plaintiffs do not have to prove their entire case to get by a challenge to personal jurisdiction over a defendant.  Plain­tiffs have alleged a conspiracy with sufficient specifici­ty to provide the circuit court with jurisdic­tion over Charter.

Accordingly, the order of the circuit court denying defendant's motion to dismiss for lack of personal jurisdiction over Charter is affirmed.

Affirmed.

GREEN, J., concurs.

COOK, J., specially concurs.

JUSTICE COOK, specially concurring:

There are significant differences between a trial court's resolution of a motion for summary judgment and its resolution of an objec­tion to jurisdiction.  The purpose of a motion for summary judgment is to determine the exis­tence of triable issues of fact, not to resolve those issues.  
Winnetka Bank v. Mandas
, 202 Ill. App. 3d 373, 387, 559 N.E.2d 961, 969 (1990).  In contrast, an objection to jurisdiction must actually be decided on the merits.  
Finnegan v. Les Pourvoiries Fortier, Inc.
, 205 Ill. App. 3d 17, 25, 562 N.E.2d 989, 993-94 (1990); 
cf
. 
Kutner v. DeMassa
, 96 Ill. App. 3d 243, 247, 421 N.E.2d 231, 234-35 (1981).  A trial court consider­ing an objec­tion to jurisdic­tion may take evidence on relevant disputed issues of fact.  735 ILCS 5/2-301(b) (West 1996).  A reviewing court may not disturb the trial court's findings on an objection to juris­diction unless they are against the manifest weight of the evidence.  
Finnegan
, 205 Ill. App. 3d at 25, 562 N.E.2d at 994.  

It is sometimes said that the hearing on the defendant's special appearance is the sole opportunity to defeat the juris­diction of the court.  3 R. Michael, Illinois Practice §6.2, at 61 (1989) (Civil Procedure Before Trial).  When a defen­dant loses a juris­dic­tional argument on a special appear­ance, concern has been ex­pressed that the defendant will not have any right to appeal unless the appellate court grants leave to appeal under Rule 306(a)(3) (166 Ill. 2d R. 306(2)(3)), because taking part in further pro­ceed­ings will waive the objec­tion.  Error in ruling on the objection is not waived by taking part in further proceed­ings, howev­er, where the objection is that the defendant is not "amena­ble" to process.  735 ILCS 5/2-301(c) (West 1996).  If the objection is that defendant has not been properly served, that objection is waived by taking part in the proceed­ings.  If the objection is that defendant could never be properly served, that objection is not waived by taking part in the proceedings.  Where the objec­tion is not waived it may be raised in an appeal at the conclu­sion of the trial, and it would appear that evidence presented during the trial relating to jurisdiction could also be consid­ered at that time.  

The court need not determine, where juris­dic­tion is asserted on the basis of a tortious act, whether the act or omis­sion is in fact tor­tious.  If the defen­dant or its agent performs an act or omission that causes an injury in Illinois and the plain­tiff 
alleges
 that the act or omission was tortious in nature, the jurisdictional requirement is satisfied.  
Nelson v. Miller
, 11 Ill. 2d 378, 393-94, 143 N.E.2d 673, 681 (1957); see 3 R. Michael, Illinois Prac­tice §6.5, at 68 (1989) (Civil Proce­dure Before Trial).  

The addition of the concept of conspir­a­cy to the concept of long-arm jurisdiction may broaden that juris­dic­tion.  It is no longer necessary that the defendant or its agent perform an act or omission that causes an injury in Illinois; it is only necessary that a con­spirator perform an unlawful act pursuant to and in further­ance of the conspiracy that causes an injury in Illi­nois.  
Adcock v. Brakegate, Ltd.
, 164 Ill. 2d 54, 65, 645 N.E.2d 888, 895 (1994).  Even though long-arm jurisdiction may be broadened, the tort of con­spiracy has been recog­nized in Illi­nois.  
Adcock
, 164 Ill. 2d at 62-63, 645 N.E.2d at 894.  There seems to be no good reason to ignore con­spir­a­cies in deciding long-arm jurisdic­tion.  The Illinois long-arm statute extends as far as the Constitution permits, and other courts have found jurisdic­tion based on allegations of conspiracy to be appropri­ate.  See 
Textor
, 711 F.2d at 1392-93; 
In re North Dakota Personal Injury Asbestos Litiga­tion No. 1
, 737 F. Supp. 1087, 1095 (D.N.D. 1990).  A finding of juris­dic­tion in this case is a logical exten­sion of the analysis begun in 
Gray v. American Radiator & Stan­dard Sanitary Corp.
, 22 Ill. 2d 432, 176 N.E.2d 761 (1961), that the distribu­tion of a product with the expecta­tion that the product may be used in Illinois gives jurisdiction to Illinois when an injury occurs in Illinois.  If Charter had the expecta­tion that the products of its alleged co-conspirators might be used in Illi­nois, then there is juris­diction in Illinois when an injury is caused by those products, even if Charter did not benefit from those products, or even know of their specific distribu­tion.  See 
Halberstam v. Welch
,
 705 F.2d 472, 481 (D.C. Cir. 1983), quoted in 
Adcock
, 164 Ill. 2d at 65, 645 N.E.2d at 895. 

The question before this court is not whether Charter is Cape's agent for service of process, or whether Charter is Cape's alter ego.  It is possible that Charter will be held liable in this case, as a conspirator, for the actions of corpo­rations, com­plete­ly separate from Cape, that sold asbes­tos in Illi­nois.