OLD ORCHARD URBAN LIMITED PARTNERSHIP, as Beneficiary of Trust Agreement, *et al.*, Plaintiff-Appellant, v. HARRY ROSEN, INC., Defendant-Appellee.

First District (3rd Division)   No. 1—08—0815

Opinion filed March 11, 2009.

David J. Fischer, Jonathan W. Young, David P. Vallas, and Christine E. Skoczylas, all of Wildman, Harrold, Allen & Dixon, of Chicago, for appellant.

Stephen C. Schulte, Linda T. Coberly, and Keith R.C. Pozulp, all of Winston & Strawn LLP, of Chicago, for appellee.

JUSTICE THEIS delivered the opinion of the court:

Plaintiff Old Orchard Urban Limited Partnership (Old Orchard) appeals from the order of the circuit court granting the motion to dismiss of defendant Harry Rosen, Inc., pursuant to sections 2—301 and 2—619 of the Code of Civil Procedure (the Code) (735 ILCS 5/2— 301, 2—619 (West 2006)). Specifically, the circuit court found that it lacked personal jurisdiction over Harry Rosen, a Canadian corporation, where Harry Rosen was not a party to a lease and guaranty executed by two of its subsidiaries in Illinois and where Harry Rosen was not an alter ego of its subsidiaries. On appeal, Old Orchard contends that: (1) the circuit court erred in granting Harry Rosen's motion to dismiss because Harry Rosen and its domestic subsidiaries were alter egos of one another; and (2) the circuit court abused its discretion in denying Old Orchard's request for documents pursuant to Supreme Court Rule 201(1) (210 Ill. 2d R. 201(1)) on the grounds that it was overbroad. For the following reasons, we affirm.

Old Orchard's complaint alleged the following relevant facts.[1] Old

---

[1]Additional facts and procedural history relevant to the second issue raised by Old Orchard, which pertains to a discovery request, shall be set forth below in conjunction with the discussion of that issue.

Orchard is a limited partnership and the beneficial owner of a large shopping mall in Skokie, Illinois. Harry Rosen is a Canadian corporation headquartered in Toronto, which operates 16 high-end menswear stores across Canada under the name "Harry Rosen." In the late 1980s, Harry Rosen created a wholly owned subsidiary, Harry Rosen USA (HRUSA), a Delaware corporation, which opened a Harry Rosen store in the United States. Although Harry Rosen later decided to close its American store, it continued to transact its business in the United States through HRUSA.

In the late 1990s, Harry Rosen decided to operate Hugo Boss clothing boutiques in the American market. For this venture, Harry Rosen created another corporate entity, Specialty Stores, Inc., also a Delaware corporation. Specialty Stores was a wholly owned, subsidiary of HRUSA and also the parent holding company for nine wholly owned subsidiary-affiliated companies, each of which would own and operate a Hugo Boss boutique (collectively, the SSI subsidiaries). SSI Old Orchard, Inc. (SSIOO), which owned and operated the Hugo Boss boutique at Old Orchard mall, was one of these SSI subsidiaries.

Each of the SSI subsidiaries entered into licensing agreements with Hugo Boss Licensing, Inc. The license agreements, one of which Old Orchard attached to its complaint, provided the following. The license granted each SSI subsidiary the right to operate a Hugo Boss store, a license to use the Hugo Boss "system" of selling Hugo Boss merchandise and a license to use the Hugo Boss mark. The agreements required the SSI subsidiaries to operate their stores in compliance with Hugo Boss's standards and the procedures of the Hugo Boss "system." The agreement also required the SSI subsidiaries to design and decorate their stores in accordance with Hugo Boss's specifications. Hugo Boss agreed to provide ongoing training of SSI subsidiary employees and to suggest pricing, marketing, and display techniques for the merchandise. The SSI subsidiaries would modify their stores and sales techniques if Hugo Boss directed such changes. In exchange for these rights, the SSI subsidiaries paid a monthly contribution toward Hugo Boss advertising. Harry Rosen guaranteed each of the SSI subsidiaries' performances of the license agreement. Harry Rosen also guaranteed each of the SSI subsidiaries' accounts payable to Hugo Boss Licensing, Inc.

In the complaint, Old Orchard alleged that Harry Rosen exercised "complete dominion and control" over the corporate governance, cash management, financing, and day-to-day operations of HRUSA, Specialty Stores, and the SSI subsidiaries. Specifically, all of these corporate entities maintained their corporate headquarters and principal place of business at the same location in Toronto, and the of-

ficers and boards of directors of these corporations consisted of the same individuals. The books, tax returns, and financial statements of Specialty Stores and the SSI subsidiaries were also consolidated. Harry Rosen controlled the flow of funds in and out of the SSI subsidiaries' bank accounts via a bank account maintained by HRUSA. If there were ever insufficient funds in an SSI subsidiary's bank account, HRUSA would transfer money to the account to enable the SSI subsidiary to satisfy its obligations.

Harry Rosen borrowed money from the Royal Bank of Canada to provide the initial funding for the SSI subsidiaries. Harry Rosen pledged certain of its own assets as collateral for the loan. After the SSI subsidiaries began transacting business, Harry Rosen transferred assets out of the SSI subsidiaries to satisfy this loan.

In 1999, SSIOO and Old Orchard entered into a lease agreement for retail space at Old Orchard Mall in which to open the SSIOO Hugo Boss boutique. Specialty Stores unconditionally guaranteed SSIOO's payment of its obligations under the lease.

In late 2001, Harry Rosen decided to end operations of the SSI subsidiaries. To resolve the SSI subsidiaries' obligations to Hugo Boss, Harry Rosen, which had guaranteed these obligations under the licensing agreements, sold the majority of the SSI subsidiaries' assets to Hugo Boss and agreed to pay the remainder over a certain period of time.

After SSIOO ceased operation of its boutique, Old Orchard sued Specialty Stores in United States District Court to enforce Specialty Stores' guaranty of SSIOO's lease and collect unpaid rent and other charges. Specialty Stores dissolved roughly a year after Old Orchard filed the suit but continued to defend the litigation for several months thereafter. At that point, Specialty Stores' counsel withdrew, and no new counsel ever appeared. Ultimately, on September 23, 2004, the federal district court entered a default judgment against Specialty Stores for $2,706,437.48. However, because Specialty Stores had no assets at that time, it was unable to satisfy the judgment.

Thus, Old Orchard articulated two counts in its complaint against Harry Rosen in the present action. In count I, Old Orchard sought a declaratory judgment that HRUSA, Specialty Stores, and SSIOO were alter egos of Harry Rosen to the extent that the outstanding obligations of HRUSA, Specialty Stores, and SSIOO are also the obligations of Harry Rosen. In count II, Old Orchard requested that the $2,706,437.48 default judgment entered in federal court against Specialty Stores be enforced against Harry Rosen.

In response, Harry Rosen filed a special appearance and a motion to dismiss Old Orchard's complaint for lack of personal jurisdiction

pursuant to sections 2—301 and 2—619(a) of the Code. In its motion to dismiss, Harry Rosen contended that it was not subject to personal jurisdiction in Illinois because it was a wholly separate business entity from HRUSA, Specialty Stores, and SSIOO, which did not conduct or transact business in the United States. Harry Rosen further explained that unlike the American Hugo Boss boutiques, its Canadian menswear stores operated a different kind of retail business, which sold multiple brands of high-end menswear, including Armani, Zegna, Canali, Dolce & Gabbana, Versace, Prada, Etro, and also, Hugo Boss, in addition to others. Harry Rosen also employed different individuals and offered them different benefits. Each entity also observed corporate formalities and retained separate identities. Harry Rosen attached numerous items to its motion to substantiate these facts, including an affidavit from its secretary and chief financial officer, Conrad Frejlich, certificates of incorporation for all of the entities, bank account statements for the entities, lists of employees, benefits information, and financial statements and tax returns for the entities.[2] In particular, the financial statement for SSIOO shows that the corporation had hundreds of thousands of dollars worth of inventory and fixed assets while in operation. SSIOO's and Specialty Stores' financial statements also reflected the financing and increases in financing that these subsidiaries owed their parent. Conrad Frejlich also explained that although Harry Rosen had obtained the initial funding for the SSI subsidiaries by way of a loan from the Royal Bank of Canada, the SSI subsidiaries were guarantors of that loan and the assets of the SSI subsidiaries served as collateral.

With respect to the lease agreement between SSIOO and Old Orchard, Harry Rosen explained that in late 1998, the vice president of Old Orchard met in Chicago with the chairman of Specialty Stores to discuss the possibility of opening a Hugo Boss boutique at Old Orchard mall. During lease negotiations, Old Orchard requested that Harry Rosen guaranty SSIOO's lease. However, Harry Rosen would not agree to be guarantor. Thereafter, Old Orchard's vice president requested financial information regarding Specialty Stores. On June 18, 1999, Conrad Frejlich, the chief financial officer and secretary of Specialty Stores, sent the vice president a letter, printed on Specialty Stores' letterhead, confirming that Specialty Stores would have a net worth of not less than $500,000 U.S. prior to the date of SSIOO's possession of the premises at the mall. Frejlich also enclosed a copy of Specialty Stores' financial statements with the letter.

---

[2]These documents also show that the venture of opening Hugo Boss boutiques in the United States was not profitable, and ultimately resulted in roughly $8 million of losses for Specialty Stores and its subsidiaries.

Thereafter, SSIOO and Old Orchard entered into the lease, and Specialty Stores executed the guaranty. Harry Rosen was not a party to either the lease or the guaranty.

Harry Rosen also pointed out that SSIOO continued to pay its rent under the lease, which was roughly $16,000 per month, until it ceased operation. The amount of the default judgment entered by the federal district court was for rent to be paid over the remaining 7 years of the 10-year lease. Harry Rosen attached the lease and guaranty to its motion. Thus, Harry Rosen asserted that its corporate veil should not be pierced and that personal jurisdiction did not exist over it in Illinois.

Old Orchard responded to Harry Rosen's motion to dismiss by reiterating that Harry Rosen controlled the SSI subsidiaries, particularly with regard to cash management. Old Orchard further asserted that Harry Rosen only superficially observed corporate formalities and treated the SSI subsidiaries' employees as its own. In support of this argument, Old Orchard attached various employment documents that had been distributed to one of SSIOO's employees, some of which were printed on Harry Rosen letterhead and which referred to Harry Rosen employment policies, goals, and standards. Old Orchard also pointed out that Harry Rosen had paid the cost of defending Specialty Stores in the federal lease litigation. In support, Old Orchard attached Harry Rosen's response to certain interrogatories, in which it admitted as much.

Harry Rosen responded that it had not engaged in any fraud, misconduct, or abuse of the corporate form such that piercing the corporate veil would be equitable. Harry Rosen attached, *inter alia*, another affidavit from Conrad Frejlich averring that Harry Rosen did not treat its subsidiaries' funds as its own and that its books accurately reflected the transfers of money between the corporate layers.

Following a hearing, the circuit court granted Harry Rosen's motion to dismiss. In a written memorandum, the court found that no basis existed to exercise either general or specific personal jurisdiction over Harry Rosen in Illinois where Harry Rosen was not a party to either the lease or the guaranty out of which the judgment in question arose and where SSIOO and Harry Rosen were engaged in separate and distinct businesses. The court further found that Old Orchard made no allegations of fraud or misrepresentation such that it could find that SSIOO or Specialty Stores were alter egos of Harry Rosen. The court also found that Harry Rosen's cash management system and payment of legal fees for Specialty Stores did not constitute grounds for piercing Harry Rosen's corporate veil. Thus, the court dismissed the entirety of Old Orchard's complaint for lack of personal jurisdiction. Old Orchard subsequently filed this timely appeal.

Old Orchard now contends that the circuit court erred in granting Harry Rosen's motion to dismiss for lack of personal jurisdiction. Section 2—301 of the Code provides that a party may object to the circuit court's jurisdiction by filing a motion to dismiss the entire proceeding or to quash service of process, which is made in the manner of a section 2—619(a) motion. 735 ILCS 5/2—301(a) (West 2006); see also *Cameron v. Owens-Corning Fiberglas Corp.*, 296 Ill. App. 3d 978, 983-84, 695 N.E.2d 572, 576 (1998). The plaintiff bears the burden of establishing a *prima facie* case for the exercise of personal jurisdiction over the defendant; however, uncontradicted evidence may overcome the *prima facie* case and defeat jurisdiction. *Morecambe Maritime, Inc. v. National Bank of Greece, S.A.*, 354 Ill. App. 3d 707, 710, 821 N.E.2d 780, 784 (2004). Where a circuit court has granted a motion to dismiss for lack of personal jurisdiction based on documentary evidence only, we review that determination *de novo*, just as we would review a section 2—619(a) motion. *Morecambe Maritime*, 354 Ill. App. 3d at 710, 821 N.E.2d at 784; *Cameron*, 296 Ill. App. 3d at 984, 695 N.E.2d at 576.

Illinois courts traditionally use a two-prong analysis to evaluate whether they can assert personal jurisdiction over a nonresident defendant. *Rollins v. Ellwood*, 141 Ill. 2d 244, 271, 565 N.E.2d 1302, 1314 (1990); *Commerce Trust Co. v. Air 1st Aviation Cos.*, 366 Ill. App. 3d 135, 140, 851 N.E.2d 131, 135 (2006). First, the court must consider whether the exercise of jurisdiction is permitted by the Illinois long-arm statute (735 ILCS 5/2—209 (West 2006)), and, second, the court considers whether the exercise of jurisdiction comports with the due process guarantees of both the Illinois and United States Constitutions. *Rollins*, 141 Ill. 2d at 271, 565 N.E.2d at 1314; *Commerce Trust*, 366 Ill. App. 3d at 140, 851 N.E.2d at 135. Although the first step of this two-step process has been collapsed into the second step by the enactment of a "catch-all provision" in the long-arm statute (735 ILCS 5/2—209(c) (West 2006)), which now simply allows Illinois courts to exercise jurisdiction whenever federal and state due process permit, a brief digression into the long-arm statute is helpful to our discussion of the jurisdictional issue presented here. *Kostal v. Pinkus Dermatopathology Laboratory, P.C.*, 357 Ill. App. 3d 381, 385-87, 827 N.E.2d 1031, 1035-36 (2005).

■ Old Orchard maintains that personal jurisdiction exists over Harry Rosen because the lease and guaranty between SSIOO and Specialty Stores constituted a business transaction in Illinois. The long-arm statute provides that an Illinois court may exercise personal jurisdiction over a nonresident defendant if it transacts any business within the state. 735 ILCS 5/2—209(a)(1) (West 2006); see also *Kostal*,

357 Ill. App. 3d at 384-85, 827 N.E.2d at 1034-35. Transacting business, as codified in subsection (a)(1), is distinct from "doing business," as codified in subsection (b)(4). *Kostal*, 357 Ill. App. 3d at 385, 827 N.E.2d at 1035. A corporation is "doing business" in a jurisdiction when it " 'engages in a continuous and systematic course of business in the State,' " which is a high standard. *Kostal*, 357 Ill. App. 3d at 385, 827 N.E.2d at 1035, quoting *Kadala v. Cunard Lines, Ltd.*, 226 Ill. App. 3d 302, 314, 589 N.E.2d 802, 810 (1992). However, once this standard has been satisfied, the corporation is considered a resident of Illinois and may be sued for any cause of action, regardless of whether that cause of action arose out of the corporation's actions within Illinois. *Kostal*, 357 Ill. App. 3d at 385, 827 N.E.2d at 1035. This type of jurisdiction is also known as "general jurisdiction." *Kostal*, 357 Ill. App. 3d at 385, 827 N.E.2d at 1035; see also *Borden Chemicals & Plastics, L.P. v. Zehnder*, 312 Ill. App. 3d 35, 41, 726 N.E.2d 73, 78-79 (2000).

In contrast, where a corporation is merely "transacting business" within the state, the state only has jurisdiction over those causes of action that arise out of the business transaction or transactions that took place within the state. *Kostal*, 357 Ill. App. 3d at 385, 827 N.E.2d at 1035. This type of jurisdiction is known as "specific jurisdiction." *Kostal*, 357 Ill. App. 3d at 385, 827 N.E.2d at 1035; *Zehnder*, 312 Ill. App. 3d at 41, 726 N.E.2d at 78-79.

■ Here, Old Orchard claims that only specific personal jurisdiction exists over Harry Rosen. An Illinois court may not exert specific personal jurisdiction over a defendant unless federal and Illinois due process concerns are satisfied. *Kostal*, 357 Ill. App. 3d at 388, 827 N.E.2d at 1037. Under the federal standard, a court may not exercise specific personal jurisdiction over a defendant unless the defendant has " 'certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' " *Rollins*, 141 Ill. 2d at 271, 565 N.E.2d at 1314, quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 90 L. Ed. 95, 102, 66 S. Ct. 154, 158 (1945), quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 85 L. Ed. 278, 283, 61 S. Ct. 339, 343 (1940). This is said to occur where the defendant has purposefully directed its activities at the residents of the forum state and the suit involves injuries that allegedly arise out of those activities. *Kostal*, 357 Ill. App. 3d at 389, 827 N.E.2d at 1038, citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 85 L. Ed. 2d 528, 540-41, 105 S. Ct. 2174, 2182 (1985). The unilateral activity of another party who claims some relationship with a nonresident defendant cannot satisfy the "purposeful availment" requirement. *Burger King*, 471 U.S. at 474, 85 L. Ed. 2d at 542, 105 S. Ct. at 2183.

Old Orchard does not allege that Harry Rosen itself directed any activity toward residents of Illinois. Moreover, the record establishes that Harry Rosen expressly refused to participate in the transaction in question. The refusal to participate in a transaction cannot form the basis of specific jurisdiction. See, *e.g.*, *Cook Associates, Inc. v. Lexington United Corp.*, 87 Ill. 2d 190, 198-99, 429 N.E.2d 847, 851 (1981) (finding that an offeree's rejection of an offer of employment after an interview in Chicago could not form the basis of jurisdiction over the defendant employment agency in Illinois even where the offeree later accepted ostensibly the same offer after an interview in Missouri). Indeed, the refusal to participate in a transaction seems to be the complete antithesis of "purposeful availment." See *Burger King*, 471 U.S. at 474-75, 85 L. Ed. 2d at 542, 105 S. Ct. at 2183. Therefore, the actions of Harry Rosen itself cannot form the basis of personal jurisdiction here.

■ Instead, Old Orchard argues that specific personal jurisdiction exists over Harry Rosen because it so dominated and controlled its domestic subsidiaries, Specialty Stores and SSIOO. In support of this claim, Old Orchard alleged that Harry Rosen arranged for the financing of Specialty Stores and the SSI subsidiaries; controlled the flow of money between the corporations, treating its subsidiaries' extra cash as its own; had the same officers and directors as its subsidiaries; blurred the distinction between the SSI subsidiaries' employees and its own; and generally exercised complete control over the daily affairs of its subsidiaries.

Illinois courts will, in certain circumstances, exercise general personal jurisdiction over a nonresident parent corporation based upon its relationship with a local subsidiary. See *Maunder v. DeHavilland Aircraft of Canada Ltd.*, 102 Ill. 2d 342, 352-53, 466 N.E.2d 217, 222-23 (1984). Such an exercise of jurisdiction is proper where "a subsidiary corporation is acting as the parent corporation's Illinois agent in the sense of conducting the parent's business rather than its own." *Alderson v. Southern Co.*, 321 Ill. App. 3d 832, 854, 747 N.E.2d 926, 944 (2001) (discussing *Maunder*). However, to be clear, because parents of wholly owned subsidiary corporations necessarily control and direct the activities of the subsidiaries to some extent, Illinois courts will not permit the exercise of personal jurisdiction over a subsidiary's parent simply because it is the parent. *Alderson*, 321 Ill. App. 3d at 854, 747 N.E.2d at 944. The critical question is whether the Illinois subsidiary exists for no purpose other than conducting the business of its parent. *Alderson*, 321 Ill. App. 3d at 855, 747 N.E.2d at 944.

This so-called *Maunder* theory of jurisdiction does not turn on

whether the distinction of separate corporate identities has been blurred. *Alderson*, 321 Ill. App. 3d at 854, 747 N.E.2d at 944. The existence of common officers of both the parent and the subsidiary, without more, is also not sufficient to permit such an exercise of personal jurisdiction. *Morecambe Maritime*, 354 Ill. App. 3d at 711, 821 N.E.2d at 785.

Although no Illinois courts have employed the *Maunder* theory to determine whether specific personal jurisdiction exists, a number of federal decisions applying Illinois law have. See, *e.g.*, *Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 940 (7th Cir. 2000); *United States Gypsum Co. v. LaFarge North America, Inc.*, 508 F. Supp. 2d 601, 643 (N.D. Ill. 2007); *FAIP North America, Inc. v. Sistema S.R.L.*, No. 05 C 4002, slip op. at 4 (N.D. Ill. December 14, 2005). We see no reason why this analysis could not be used to address specific jurisdiction issues.

Applying that theory, the record discloses that Harry Rosen and Specialty Stores were engaged in separate, distinct business ventures. Harry Rosen operates what could be described as menswear department stores across Canada, which offer a variety of different styles and brands of menswear. Those stores operate under the name Harry Rosen. In contrast, the SSI subsidiaries operated Hugo Boss boutiques, which sold only the Hugo Boss line. In addition, the SSI subsidiaries were required to use the Hugo Boss "system" of marketing and selling the merchandise. Pursuant to that "system," Hugo Boss, and not Harry Rosen, directed how the stores would be designed and decorated. Hugo Boss also trained the SSI subsidiaries' employees in Hugo Boss sales and marketing techniques.

With regard to the lease and guaranty transactions that are particularly at issue, we similarly cannot say that Specialty Stores and SSIOO were acting as Harry Rosen's agents rather than conducting their own businesses. Harry Rosen expressly refused to enter into the guaranty, and Old Orchard accepted that refusal and leased the space to SSIOO anyway. Based on these facts, we cannot say that Specialty Stores and the SSI subsidiaries were merely conducting Harry Rosen's business in the United States. Specialty Stores and the SSI subsidiaries were engaged in a distinct business venture, which Harry Rosen ultimately sold with no impact on Harry Rosen's Canadian operations.

Although the record also discloses that Harry Rosen, Specialty Stores, and SSIOO filed consolidated tax returns and had the same officers and directors, Harry Rosen procured the initial funding for Specialty Stores and the SSI subsidiaries, and Harry Rosen controlled the flow of cash between itself and its subsidiaries, these factors are not dispositive under *Maunder* and its progeny. See *Alderson*, 321 Ill.

App. 3d at 854, 747 N.E.2d at 944. Parent corporations necessarily direct and control some aspects of their subsidiaries' businesses. *Alderson*, 321 Ill. App. 3d at 854, 747 N.E.2d at 944.

The determinative question is whether the parent corporation is simply attempting to shield itself from lawsuits by conducting its own business through the legal fiction of "separate" subsidiaries and distribution networks. See *Maunder v. DeHavilland Aircraft of Canada, Ltd.*, 112 Ill. App. 3d 879, 883, 445 N.E.2d 1303, 1306 (1983), *aff'd*, 102 Ill. 2d 342, 466 N.E.2d 217 (1984). Here, Harry Rosen was not merely trying to shield itself from American lawsuits arising from the conduct of its own business when it formed Specialty Stores and the SSI subsidiaries. We accordingly find that Specialty Stores and SSIOO were conducting their own separate business. See, *e.g.*, *Morecambe Maritime*, 354 Ill. App. 3d at 712, 821 N.E.2d at 785 (declining to find jurisdiction over foreign parent corporation under *Maunder* in breach of contract action where its domestic subsidiary was a separate, fully capitalized corporation that generated its own business, paid its own bills, and was not controlled by its parent on a day-to-day basis).

Old Orchard also maintains that specific personal jurisdiction over Harry Rosen in Illinois is proper because Harry Rosen was an alter ego of its subsidiaries. Before addressing that issue on its merits, we must determine what law to apply. Both Old Orchard and Harry Rosen claim that Delaware law governs this issue because Specialty Stores and SSIOO were incorporated in that state. We disagree.

Illinois law governs whether an Illinois court may exercise personal jurisdiction over a defendant. See, *e.g.*, *Rollins*, 141 Ill. 2d at 268-69, 565 N.E.2d at 1313. At the same time, Illinois law provides that efforts to pierce the corporate veil are governed by the law of the state of incorporation. *Westmeyer v. Flynn*, 382 Ill. App. 3d 952, 957, 889 N.E.2d 671, 676 (2008) (applying Delaware law to determine whether the plaintiff could pierce the corporate veil in a declaratory judgment action to collect a judgment against an insolvent corporation from the corporation's owners); *Retzler v. Pratt & Whitney Co.*, 309 Ill. App. 3d 906, 917, 723 N.E.2d 345, 354 (1999) (applying Delaware law to determine whether to pierce the corporate veil of a corporation in a negligence and strict liability action); *Kern v. Chicago & Eastern Illinois R.R. Co.*, 6 Ill. App. 3d 247, 250, 285 N.E.2d 501, 503 (1972), citing Restatement (Second) of Conflicts §304 (1971), and 11 W. Fletcher, Corporations §5334 (perm. ed. rev. 1971) (applying Indiana law to determine whether to pierce the corporate veil to compel the corporation to issue a dividend from subsidiary's earnings).

We have found only one Illinois decision, *Petrich v. MCY Music World, Inc.*, 371 Ill. App. 3d 332, 344, 862 N.E.2d 1171, 1182 (2007),

that has applied the law of the state of incorporation to determine whether to pierce the corporate veil for purposes of establishing personal jurisdiction. However, because that case mechanically applied the law of the state of incorporation without addressing this issue, we find its holding unpersuasive and decline to follow it here. Moreover, we do not believe that Delaware law should determine whether an Illinois court may exercise personal jurisdiction.

We find it significant that the majority of federal decisions that have examined this issue have applied the law of the forum state and not the state of incorporation. See, *e.g.*, *Gammino v. Verizon Communications, Inc.*, No. 03 CV 5579, slip op. at 3 (E.D. Pa. December 27, 2005) (applying Pennsylvania law as articulated in *Botwinick v. Credit Exchange, Inc.*, 419 Pa. 65, 70, 213 A.2d 349, 353 (1965) to determine whether parent was an alter ego of its subsidiary for purposes of establishing jurisdiction); *Harte-Hanks Direct Marketing/Baltimore, Inc. v. Varilease Technology Finance Group, Inc.*, 299 F. Supp. 2d 505, 514 n.7 (D. Md. 2004) (applying Maryland law); see also *Gruca v. Alpha Therapeutic Corp.*, 19 F. Supp. 2d 862, 866 (N.D. Ill. 1998) (applying Illinois law, but not discussing the issue). Specifically, in *International Bancorp L.L.C. v. Societe Des Bains De Mer Et Du Cercle Des Etrangers A Monaco*, 192 F. Supp. 2d 467, 476-77 (E.D. Va. 2002), the United States District Court for the Eastern District of Virginia determined that the law of the forum state, in that case Virginia, and not the law of the state of incorporation, should govern whether the court had personal jurisdiction. The court explained that the forum state, and not the domiciliary state of the corporation, had the greater interest in the jurisdictional reach of the forum state's courts. *International Bancorp*, 192 F. Supp. 2d at 477. The court also pointed out that in *Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 337-38, 69 L. Ed. 634, 642-43, 45 S. Ct. 250, 251-52 (1925), the United States Supreme Court held that the substantive law of the state of incorporation did not affect the issue of personal jurisdiction in the forum state. *International Bancorp*, 192 F. Supp. 2d at 477 n.18. The court also observed that for determining liability, rather than jurisdiction, Virginia would employ the domiciliary state's law. *International Bancorp*, 192 F. Supp. 2d at 477 n.18.

We believe that the rationale of *International Bancorp* strikes the right balance in determining what law to apply. We therefore find that although the law of the state of incorporation applies when a party seeks to substantively pierce a corporation's veil, Illinois law governs the analysis where a party uses veil piercing to establish personal jurisdiction.

Illinois regards a parent corporation as a separate legal entity

from a wholly owned subsidiary, even where the two entities have mutual dealings. *In re Rehabilitation of Centaur Insurance Co.*, 158 Ill. 2d 166, 172-73, 632 N.E.2d 1015, 1017 (1994). Illinois will disregard this legal separation and pierce the corporate veil only where the subsidiary is so controlled, and its affairs so conducted, by a parent that observance of the fiction of separate identities would sanction a fraud or promote injustice. *Centaur Insurance*, 158 Ill. 2d at 173, 632 N.E.2d at 1017-18. This doctrine has traditionally been used by third parties injured by their reliance on the existence of a separate and distinct corporate entity. *Centaur Insurance*, 158 Ill. 2d at 173, 632 N.E.2d at 1018.

Before determining whether fraud or injustice has been shown, courts will first look to whether there is a unity of interest and ownership such that the separate identities of the entities are nonexistent. *Miner v. Fashion Enterprises, Inc.*, 342 Ill. App. 3d 405, 414, 794 N.E.2d 902, 911 (2003). In making this determination, courts will look to a number of factors, including whether there is inadequate capitalization, a failure to observe corporate formalities, insolvency on the part of the debtor corporation, and an absence of corporate records. *Miner*, 342 Ill. App. 3d at 414, 794 N.E.2d at 911. Importantly, the use of common officers and directors, or the sharing of office space, without more, does not render one corporation liable for the obligations of another. *Pederson v. Paragon Pool Enterprises*, 214 Ill. App. 3d 815, 820, 574 N.E.2d 165, 168 (1991).

Here, the allegations in the record do not justify piercing the corporate veil. Specialty Stores and SSIOO observed corporate formalities, held substantial inventory and assets, and conducted their own business separate from Harry Rosen. Further, Specialty Stores and SSIOO remained solvent and continued to pay their bills, including rent, until Harry Rosen made the decision to sell the SSI subsidiaries to Hugo Boss and get out of the American market. We cannot say that these financial aspects of Specialty Stores' and SSIOO's business demonstrate the requisite unity of corporate identity. *Cf. Gallagher v. Reconco Builders, Inc.*, 91 Ill. App. 3d 999, 1005-06, 415 N.E.2d 560, 564-65 (1980) (finding that the court was justified in piercing the veil of a corporation that was so grossly undercapitalized that it could not conduct its day to day business and the corporation observed virtually no formalities).

As to whether Old Orchard would suffer injustice or fraud if the separate corporate identities were maintained, Old Orchard has failed to allege any thing of that nature occurred here. In fact, relying on a United States District Court opinion, *United States Gypsum Co. v. LaFarge North America, Inc.*, 508 F. Supp. 2d 601, 643 (N.D. Ill. 2007),

Old Orchard claims that a showing of fraud or injustice is not required to establish personal jurisdiction under an alter ego theory in Illinois. We disagree.

Considerable confusion has arisen among federal decisions applying Illinois law over whether the *Maunder* analysis is distinct from the equitable device of piercing the corporate veil. See, *e.g.*, *Central States*, 230 F.3d at 940; *IDS Life Insurance Co. v. SunAmerican Life Insurance Co.*, 136 F.3d 537, 540 (7th Cir. 1998). Indeed, *United States Gypsum* blurs the distinction between alter ego theory and *Maunder*. *United States Gypsum*, 508 F. Supp. 2d at 643; see also *FAIP North America, Inc. v. Sistema S.R.L.*, No. 05 C 4002, slip op. at 4 (N.D. Ill. December 14, 2005). But see *Gruca v. Alpha Therapeutic Corp.*, 19 F. Supp. 2d 862, 866 (N.D. Ill. 1998) (recognizing the distinction and explaining that "Illinois courts appear to use two approaches in examining whether the activities of the subsidiary give rise to jurisdiction over the parent").

The decisions of our state courts make clear that piercing the corporate veil is a distinct analysis from the *Maunder* agency theory of jurisdiction. Notably, in *Maunder*, the supreme court declined to engage in an alter ego analysis after it found jurisdiction based on the agency theory, implying that these are two distinct means of establishing personal jurisdiction in Illinois. *Maunder*, 102 Ill. 2d at 354, 466 N.E.2d at 223. That alter ego theory is distinct from *Maunder* was also implied in *Alderson*, in which we explained that blurring of separate corporate identities was not dispositive but, rather, separate corporate formalities may be observed and jurisdiction may nevertheless be obtained over the parent if the subsidiary is functioning as the parent's agent. *Alderson*, 321 Ill. App. 3d at 854, 747 N.E.2d at 944. Thus, Old Orchard is not relieved of its burden to establish that fraud or injustice before we may pierce the corporate veil.

To that end, Old Orchard knew that it would have no recourse against Harry Rosen in the event SSIOO defaulted on its obligations under the lease. Although Old Orchard initially requested that Harry Rosen guaranty SSIOO's lease, Old Orchard ultimately agreed to a guaranty from only Specialty Stores, even after being apprised of Specialty Stores' financial situation. The mere fact that Specialty Stores and SSIOO failed to be profitable and ultimately went out of business does not justify piercing the corporate veil. See *Jacobson v. Buffalo Rock Shooters Supply, Inc.*, 278 Ill. App. 3d 1084, 1090, 664 N.E.2d 328, 332 (1996) (declining to pierce the veil of a corporation which operated out of the same building as its owner and blurred some of the distinctions of separation, but had adequate assets and continued to do business until an explosion destroyed it, rendering it

insolvent). We therefore do not find that piercing the corporate veil is warranted here, at least for the purpose of establishing jurisdiction over Harry Rosen. See, *e.g.*, *Tower Investors, LLC v. 111 East Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 1033-34, 864 N.E.2d 927, 941 (2007) (finding that where party claiming injury was fully aware of an entity's identity and situation, it could not demonstrate the fraud or injustice required to pierce the corporate veil).

In conclusion, it would be very unsettling to impose jurisdiction over a corporation based on a transaction in which it had expressly refused to participate. Such an exercise of jurisdiction would surely not comport with the "notions of fair play and substantial justice" that due process requires. See, *e.g.*, *Burger King*, 471 U.S. at 476, 85 L. Ed. 2d at 543, 105 S. Ct. at 2184. Accordingly, we affirm the trial court's determination that specific personal jurisdiction does not exist over Harry Rosen in Illinois.

■ The second issue raised by Old Orchard in this appeal is whether the circuit court abused its discretion in denying Old Orchard's requested for documents pursuant to Supreme Court Rule 201(1) on the grounds that it was overbroad. The requested items in question included "any and all" documents and communications between the attorneys involved in the federal district court litigation between Old Orchard, Specialty Stores, and SSIOO. The requested items also included "any and all documents" referring to transfers or payments made between Harry Rosen and Specialty Stores.

The trial court is afforded wide latitude to control the scope of discovery, and we may reverse a trial court's decision in that regard only where there has been a manifest abuse of discretion. *Rokeby-Johnson v. Derek Bryant Insurance Brokers, Ltd.*, 230 Ill. App. 3d 308, 316, 594 N.E.2d 1190, 1196 (1992). The trial court does not abuse its discretion when it denies such blanket requests as overbroad. See, *e.g.*, *People v. Teller*, 207 Ill. App. 3d 346, 351, 565 N.E.2d 1046, 1049 (1991). Therefore, the trial court's determination here must stand.

For these reasons, we affirm the order of the circuit court dismissing this case for lack of personal jurisdiction.

Affirmed.

QUINN and COLEMAN, JJ., concur.